UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA              :

    - v. -                                        :

RAMSES OWENS,                             :
    a/k/a "Ramses Owens Saad,"
DIRK BRAUER,                               :
RICHARD GAFFEY,                                                    18 Cr. 693 (RMB)
    a/k/a "Dick Gaffey," and            :
HARALD JOACHIM VON DER GOLTZ,
    a/k/a "H.J. von der Goltz,"          :
    a/k/a "Johan von der Goltz,"
                                            :

                      Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

# GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS
# MOTION REGARDING APPLICATION OF THE CRIME FRAUD EXCEPTION
# AND WAIVER OF THE ATTORNEY-CLIENT PRIVILEGE

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

DEBORAH CONNOR
Chief, Money Laundering and Asset
Recovery Section, Criminal Division

On the Memorandum:

EUN YOUNG CHOI and THANE REHN
Assistant United States Attorneys, United States Attorney's Office, Southern District of New York

MICHAEL PARKER and PARKER TOBIN
Trial Attorneys, Criminal Division, United States Department of Justice

**Table of Contents**

PRELIMINARY STATEMENT ..................................................................................................... 4

BACKGROUND ........................................................................................................................... 5

   I.   The Pending Charges Against Von Der Goltz .................................................. 5

   II.   Von Der Goltz's Fraudulent Conduct ............................................................ 6

      A. Von der Goltz's Beneficial Ownership of the Relevant Entities and Assets ................... 7

      B. The Evasion of von der Goltz's Reporting and Tax Obligations ...................................... 9

      C. The Fraud Regarding the Swiss Bank Revack Accounts ................................................ 11

      D. The False Reports of Foreign Bank and Financial Accounts........................................... 12

      E. Von der Goltz's False Statements to the DOJ and Waiver of the Privilege..................... 14

   III.   Belated Efforts by von der Goltz to Assert the Privilege ................................ 16

   IV.   Von der Goltz Disclaims Privilege in the Relevant Information and Waives the U.S. Law Firm Privilege ................................................................................................... 17

   V.   The Relevant Information ............................................................................. 18

ARGUMENT ............................................................................................................................. 19

   I.   The Crime-Fraud Exception Applies to the Relevant Information.................... 19

      A.   The Applicable Law ............................................................................. 19

      B.   Discussion........................................................................................... 22

   II.   Von Der Goltz Has Waived the Privilege Over the Relevant Information .................. 25

      A. The Applicable Law .............................................................................. 25

      B. Discussion ............................................................................................ 27

CONCLUSION.......................................................................................................................... 32

# Table of Authorities

## Cases

*A.I.A. Holdings, S.A. v. Lehman Brothers, Inc.*, No. 97 Cir. 4978, 1999 WL 61442 (S.D.N.Y. Feb. 3, 1999) ................................................................................................... 20

*Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, No. 93 Civ. 5298 (LMM) (RLE), 1996 WL 944011 (S.D.N.Y. Dec. 19, 1996) ................................................................. 28

*Business Integration Services, Inc. v. AT & T Corp.*, 251 F.R.D. 121, 129 (S.D.N.Y.2008)....... 26

*Cendant Crop v. Shelton* 246 F.R.D. 401, 406 (D. Conn. 2007)............................................ 24

*Chevron Corp. v. Salazar*, 275 F.R.D. 437, 446 (S.D.N.Y. 2011) ............................................ 27

*Clarke v. J.P. Morgan Chase & Co.*, No. 08CIV02400(CM)(DF), 2009 WL 970940 (S.D.N.Y. Apr. 10, 2009) ......................................................................................... 26, 29

*Danisco A/S v. Novozymes A/S*, 427 F. Supp. 2d 443, 444 (S.D.N.Y. 2006) .............................. 21

*Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975)................................................................. 23

*In re 650 Fifth Ave.*, No. 08 CIV. 10934 KBF, 2013 WL 3863866 (S.D.N.Y. July 25, 2013) .... 22

*In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1038 (2d Cir.1984) ...................................................................................... 4, 20, 21, 24

*In re John Doe, Inc.*, 13 F.3d 633, 637 (2d Cir. 1994) ................................................. 20, 21, 24

*In re Leslie Fay Cos., Inc. Sec. Litig.*, 161 F.R.D. 274, 282 (S.D.N.Y. 1995) ........................... 26

*In re Parmalat Sec. Litig.*, No. 04 MD 1653, 2006 WL 3592936 (S.D.N.Y. Dec. 1, 2006) .. 25, 26

*In re Philip Servs. Corp. Sec. Litig.*, No. 98 Cv. 0835 (MBM) (DF), 2005 WL 2482494 (S.D.N.Y. Oct. 7, 2005) .................................................................................... 27

*In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995).................................................... 20, 21

*In re Sealed Case*, 872 F.2d 976, 980 (D.C. Cir. 1989).......................................................... 25

*In re Teleglove Commn'cs Corp.*, 493 F.3d 345, 361 (3d Cir. 2007) ...................................... 27

*In re Von Bulow*, 828 F.2d 94, 100 (2d Cir. 1987) ............................................................... 28

*Murray v. Gemplus Intern., S.A.*, 217 F.R.D. 362, 367 (E.D.P.A. 2003) ................................. 26

*Permian Corp. v. United States*, 665 F.2d 1214, 1220 & n.11 (D.C. Cir. 1981)........................ 25

*S.E.C. v. Lavin*, 111 F.3d 921, 929 (D.C. Cir. 1997) ............................................................ 25

*United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991)...................................... 26, 29, 30

*United States v. de la Jara*, 973 F.2d 746, 750 (9th Cir. 1992) ............................................ 26

*United States v. Goldberger & Dubin*, 935 F.2d 501, 504 (2d Cir. 1991)................................. 19

*United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997) ...................................................... 21

*United States v. Kaplan*, No. 02 Cr. 883 (DAB), 2003 WL 22880914 (S.D.N.Y. Dec. 5, 2003) 20, 22

*United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961) ............................................... 19

*United States v. Levin*, 2015 WL 5838579 (S.D.N.Y. Oct. 5, 2015)........................................ 23

*United States v. Tucker*, 254 F. Supp. 3d 620, 625 (S.D.N.Y. 2017) .................................... 22, 23

*United States v. Zolin*, 491 U.S. 554, 563 (1989) .......................................................... 20, 21, 24

## PRELIMINARY STATEMENT

The Government respectfully requests that this Court enter an order that the crime-fraud exception to the attorney-client privilege and work-product protections applies to certain communications and documents (the "Relevant Information") and, additionally, that the attorney-client privilege and work-product protections have been waived with respect to these documents. The Relevant Information includes all communications and documents for which any claim of privilege is based on the attorney-client relationship between either defendant Harald Joachim von der Goltz ("von der Goltz") or any other person or entity and attorneys at the law firms Mossack Fonseca & Co. ("Mossack Fonseca") and ███████████ or ███████████ (collectively, the "Owens Firms"),[1] to the extent that those communications concern or relate to the Revack Entities, the Revack Trust, or the Revack Holdings Foundation.[2]

The crime-fraud exception to the attorney-client privilege and to work-product protections applies when the Government shows that there is probable cause to believe that (1) a fraud or crime has been attempted or committed, and (2) the communications or materials in question were in furtherance of the fraud or crime. *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1038 (2d Cir.1984). For the reasons set forth below, the Government has satisfied its burden of showing that the crime-fraud exception applies to the Relevant Information: a grand jury found probable cause that von der Goltz conspired with his agents, including his

---

[1] The Government has publicly filed a redacted version of this Memorandum, along with a redacted version of the exhibits to the accompanying Affirmation of Thane Rehn, so as to protect the identities of unindicted individuals and entities. The Government respectfully requests the Court to allow for it to file an unredacted version of its Memorandum and the exhibits under seal.

[2] References to the attorney-client privilege in this Memorandum include the attorney-client privilege and any protections or privileges deriving from the attorney-client privilege, including work product privilege.

attorney Ramses Owens and his accountant Richard Gaffey, who are named in the Indictment as co-conspirators, to hide von der Goltz's beneficial ownership of assets held by the Revack Entities.

In addition to the crime-fraud exception, von der Goltz and his agents voluntarily and intentionally waived any privilege over the Relevant Information in three ways.  First, von der Goltz selectively disclosed and discussed the contents of the Relevant Information with the Government and made no effort to invoke the privilege until many months later.   Second, von der Goltz further waived any privilege over the Relevant Information by failing to take any steps to assert the privilege after the public dissemination of communications purportedly covered by the privilege.   Third, von der Goltz waived the privilege by waiving the attorney-client privilege in his relationship with attorneys at the law firm ████████████ (the "U.S. Law Firm"), and taking the position that his communications with the U.S. Law Firm bear on von der Goltz's *mens rea* with respect to the charges in the Indictment, including the charges pertaining to the Relevant Information. Consequently, this Court should rule that the Relevant Information is not protected by privilege, and should be disclosed to the Prosecution Team in this case.

## **BACKGROUND**

### I.     **The Pending Charges Against Von Der Goltz**

Harald Joachim von der Goltz is charged in Indictment 18 Cr. 693 (RMB) (the "Indictment") with conspiracy to commit tax evasion, wire fraud, money laundering conspiracy, willful failure to file Reports of Foreign Bank and Financial Accounts ("FBARs"), and making false statements.   As alleged in the Indictment, von der Goltz:   (1) conspired with others, including defendants Ramses Owens and Richard Gaffey, to evade and defeat a substantial part of the income tax that von der Goltz owed to the United States of America, in violation of Title 18,

5

United States Code, Section 371 (Count Three); (2) participated in a fraudulent scheme to conceal his assets and investments, and the income generated by those assets and investments, from the Internal Revenue Service ("IRS"), in violation of Title 18, United States Code, Sections 1343 and 2 (Count Four); (3) conspired with others, including Owens and Gaffey, to transport, transmit and transfer monetary instruments and funds to and from the United States, with the intent to promote the carrying on of their fraudulent scheme, in violation of Title 18, United States Code, Section 1956(h) (Count Five); (4) knowingly and willfully failed to file FBARs disclosing that von der Goltz had a financial interest in, or signature or other authority over, foreign bank accounts in Panama and Switzerland, in violation of Title 31, United States Code, Section 5314 and 5322(a) and Title 18, United States Code, Section 2 (Counts Six through Nine); and (5) knowingly and willfully made materially false, fictitious, and fraudulent statements and representations, in violation of Title 18, United States Code, Sections 1001(a) and 2 (Counts Ten and Eleven).   These charges stem from a pattern of fraudulent conduct by von der Goltz, some of which is summarized below.

## II.     Von Der Goltz's Fraudulent Conduct

Von der Goltz, a German-born national who grew up in Guatemala, has been a resident of the United States since approximately 1984.   (Indictment ¶ 34).   As a resident alien of the United States, von der Goltz is subject to U.S. tax laws, which require him to report and pay income tax on worldwide income, including income and capital gains generated in domestic and foreign bank accounts.   (*Id.* ¶ 35).   However, von der Goltz deliberately evaded these requirements by setting up a series of shell companies and bank accounts, and hiding his beneficial ownership of the shell companies and bank accounts from the IRS.   (*Id.*).   Von der Goltz was assisted in this scheme by

Owens, an attorney at Mossack Fonseca and, subsequently, the Owens Firms, and by Gaffey, a then-partner at ███████████████ (the "U.S. Accounting Firm").   (*Id.* ¶¶ 2, 25, 35, 49). As part of this fraudulent scheme, von der Goltz, Owens, and Gaffey falsely claimed that von der Goltz's elderly mother (the "Mother") is the sole beneficial owner of the shell companies and bank accounts at issue.   (*Id.* ¶ 36).   The Mother, at present, is approximately 102 years old.   (*Id.*). She is a Guatemalan citizen and resident, and – in contrast to von der Goltz – she is not a U.S. taxpayer.   (*Id.*).

A.   Von der Goltz's Beneficial Ownership of the Relevant Entities and Assets

Beginning in or around at least the 1980s, von der Goltz used the services of Mossack Fonseca, a Panama-based global law firm and entity, to create various foreign entities, which are shell companies (the "Revack Entities"),[3] for the purpose of holding unreported assets for himself in the U.S. and abroad.   (*Id.* ¶ 37.)   The Revack Entities were initially "owned" by an overlying trust (the "Revack Trust") and, later, by an overlying foundation (the "Revack Holdings Foundation"), which were both created by Mossack Fonseca.   (*Id.*)   The relevant documentation regarding the Revack Trust and the Revack Holdings Foundation, which dates to in or about 1988, makes clear that von der Goltz was, at all relevant times, a beneficial owner of the Revack Entities, along with the other assets of the Revack Trust and the Revack Holdings Foundation.   (*Id.*)

The Revack Trust, domiciled in the British Virgin Islands, was first formed in or about 1988.   (*Id.* ¶ 38.)   The trust agreement for the Revack Trust (the "Revack Trust Agreement"), which was written with the assistance of Mossack Fonseca, stated that upon the death of von der

---

[3] The Revack Entities include the Revack Trust, the Revack Holdings Foundation, EMJO Investments Limited, Brecknock Corporation, Goldbean Inc., Union Properties Inc., Worldwide Investment Services & Holdings Inc., and Treetop Properties Inc.

Goltz's father—which occurred in or about 1990—the assets in the trust were for the use and benefit of von der Goltz. (*Id.*) The Revack Trust Agreement identified von der Goltz as the trust's primary beneficiary, and also identified von der Goltz's wife and his three children as secondary beneficiaries. (*Id.*) The Revack Trust Agreement made no mention of the Mother, from whom von der Goltz's father was estranged at the time of the Revack Trust's creation. (*Id.*)

Later, in or about 2007, von der Goltz used the services of Mossack Fonseca, including the services of Owens, to resettle the Revack Trust into the Revack Holdings Foundation, domiciled in Panama. (*Id.* ¶ 39.) The original regulations for the foundation (the "Revack Holdings Foundation Regulations")—which were maintained by Gaffey in the files of the U.S. Accounting Firm—identified von der Goltz as the first beneficiary of the Revack Holdings Foundation, consistent with his status as the primary beneficiary of the Revack Trust, and von der Goltz's wife and his three children as the other beneficiaries of the Revack Holdings Foundation. (*Id.*) The Revack Holdings Foundation Regulations further designated von der Goltz as the founder and manager of the Revack Holdings Foundation; Gaffey as a substitute manager; Mossack Fonseca as the resident agent; and Owens as a member of the foundation council. (*Id.*) Like the Revack Trust Agreement, the Revack Holdings Foundation Regulations made no mention of the Mother. (*Id.*)

The Revack Holdings Foundation Regulations provided that von der Goltz was to contribute assets to the Revack Holdings Foundation, and that those assets were to be held and owned by the foundation. (*Id.* ¶ 40.) The Revack Holdings Foundation Regulations further stated that after von der Goltz's death, the Revack Holdings Foundation was to distribute between 20% and 40% of its annual income to his family members, *i.e.*, von der Goltz's wife and three

children, in a "tax efficient manner."   (*Id.*)   At von der Goltz's insistence, the Revack Holdings Foundation Regulations also cautioned that "[a]ny family member engaging in reprehensible conducts [sic], or marrying an unacceptable trouble making or gold-digging spouse, can be either partially or totally eliminated from receiving any benefits from the Foundation."   (*Id.*)   Von der Goltz's initial contributions to the Revack Holdings Foundation were to serve as the "base" for growth of the Revack Holdings Foundation, not only of the investments contributed, but also to provide liquidity for future investments in private equity, real estate, and "fun investments" that had been "thoroughly researched and fit into the philosophy of the founder [von der Goltz]."   (*Id.* ¶ 41.)

The Revack Holdings Foundation, through various Revack Entities, made investments of the type described in the Revack Holdings Foundation Regulations, totaling tens of millions of dollars in value.   (*Id.* ¶ 42).   For instance, the December 31, 2012 balance sheets for the Revack Holdings Foundation and the Revack Entities, which were also maintained by Gaffey in the files of the U.S. Accounting Firm, listed out the entities' various investments, including investments in private equity companies, real estate investment companies, and a watch company founded by von der Goltz.   (*Id.*)   The December 31, 2012 balance sheets further reflect that, as of that date, the investments made by the Revack Entities had a total value of approximately $35,012,126.   (*Id.*)

B.   The Evasion of von der Goltz's Reporting and Tax Obligations

Beginning in or about 2000, von der Goltz has maintained bank accounts held in the names of various Revack Entities, as well as the Revack Holdings Foundation (the "Revack Bank Accounts").   (*Id.* ¶ 43).   The Revack Bank Accounts, which included investment accounts as well as checking and savings accounts, were located both in the United States and abroad at various

financial institutions.   (*Id.*)   Von der Goltz—as the beneficiary of the Revack Trust and the Revack Holdings Foundation, and as a beneficial owner of the Revack Entities—was a beneficial owner of the assets in the Revack Bank Accounts.   (*Id.*)   However, von der Goltz, with the assistance of Owens and Gaffey, used the assets in the Revack Bank Accounts for von der Goltz's personal benefit without properly reporting the assets to the IRS or paying the appropriate income taxes on income generated by the assets as he was legally obligated to do.   (*See e.g.*, *id.* ¶¶ 43-45, 47.)

Owens and Gaffey discussed with each other the need to conceal von der Goltz's beneficial ownership status in the United States.   (*Id.* ¶ 46.)   For example, in an email to Gaffey dated June 5, 2007, Owens proposed ways in which he and Gaffey could help von der Goltz conceal his ownership in a particular Revack Entity, EMJO Investments Limited ("EMJO"), from U.S. companies in which EMJO was an investor.   (*Id.*)   Owens stated that "I know it is not good to comment this by email," but he had been unable to reach Gaffey via phone and wanted Gaffey to "see this message the soonest."   (*Id.*)   Owens then informed Gaffey that several U.S. companies had requested the "real and final beneficial owner" of EMJO, "which name, as you know, we cannot disclose."   (*Id.*)   Owens further stated that von der Goltz's passport should not be provided "as we cannot make a link" between von der Goltz and EMJO "inside the USA."   (*Id.*) Owens suggested providing, instead, the passport of the Mother.   (*Id.*)   Owens also stated that he had suggested to Mossack Fonseca that he (Owens)—who, like the Mother, is not a U.S. taxpayer—be identified as the beneficial owner of EMJO, but his partners at Mossack Fonseca "did not like the idea."   (*Id.*)

On von der Goltz's U.S. Individual Income Tax Returns, Forms 1040 ("Forms 1040") for

the tax years 2000 through and including 2016, von der Goltz falsely and fraudulently failed to report the income and capital gains generated in connection with the domestic Revack Bank Accounts.   (*Id.* ¶ 48.)   He also falsely and fraudulently failed to report his interest in, or signature or other authority over, the offshore, undeclared Revack Bank Accounts.   (*Id.*)   Moreover, for these years, von der Goltz failed to file FBARs disclosing his beneficial ownership of the offshore, undeclared Revack Bank Accounts.   (*Id.*)

   C.   The Fraud Regarding the Swiss Bank Revack Accounts

   In or around November 2007, Owens and Gaffey began working together to open certain Revack Bank Accounts for von der Goltz at ███████████ (the "Swiss Bank").   (*Id.* ¶ 51).   Those accounts were held in the names of EMJO (the "Swiss Bank EMJO Account") and the Revack Holdings Foundation (collectively, the "Swiss Bank Revack Accounts").   (*Id.*).   Owens and Gaffey determined, and discussed via email, that individuals other than von der Goltz would serve as signatories on the Swiss Bank Revack Accounts.   (*Id.*).   Ultimately, Owens, along with two other individuals, held signature authority over these accounts, which were established in or around January 2008.   (*Id.*).

   Bank account forms for the Swiss Bank Revack Accounts identified von der Goltz as the sole beneficial owner of the assets held in these accounts.   (*Id.* ¶ 52).   Notably, and consistent with the defendants' fraudulent scheme, these forms listed an address for von der Goltz in Guatemala, even though von der Goltz had been living permanently in the United States since approximately 1984, and Owens and Gaffey were well aware that von der Goltz was a U.S. resident.   (*Id.*)   Email correspondence between Owens, Gaffey, and a Swiss Bank representative reveals that during the years that the Swiss Bank Revack Accounts were held at the Swiss Bank,

von der Goltz visited the bank, met with bank representatives, and provided instructions to the bank, including instructions concerning payments that should be made from the Swiss Bank EMJO Account.   (*Id.* ¶ 53.)   In this email correspondence, the participants repeatedly referred to von der Goltz as the beneficial owner of the Swiss Bank Revack Accounts.   (*Id.*).

On or about June 14, 2013, von der Goltz received, into his personal bank account at ███ ██████████ (the "Boston Bank"), a transfer of approximately $430,000 from the Swiss Bank EMJO Account.   (*Id.* ¶ 55.)   Email correspondence from June 2013 reveals that at the time von der Goltz received this transfer from the Swiss Bank EMJO Account, he needed money to pay off an outstanding home equity line of credit at the Boston Bank.   (*Id.*)   As bank records from the Swiss Bank show, the funds from the Swiss Bank EMJO Account were the result of the liquidation of shares in precious metals held by the account.   (*Id.*)   However, because of the defendants' efforts to avoid identifying von der Goltz as a U.S. taxpayer, and the consequent lack of an IRS Form W-9[4] on file with the Swiss Bank identifying von der Goltz as such, no taxes were withheld from any capital gains generated from the sale.   (*Id.*).   Similarly, no taxes were paid on any gains generated by the sale, because von der Goltz, with Gaffey's assistance as the return preparer, filed a Form 1040 for the 2013 tax year that falsely failed to report this income to the IRS.   (*Id.*).   Von der Goltz, later, and after learning that he was under investigation for tax evasion, falsely claimed to the U.S. Department of Justice ("DOJ") that the money had been a non-taxable "gift" from a foreign person, *i.e.*, the Mother.   (*Id.* ¶ 56).

D.   The False Reports of Foreign Bank and Financial Accounts

---

[4] The IRS Form W-9 is a tax form that identifies an individual as a U.S. taxpayer.

By letter dated March 4, 2014, the Swiss Bank informed von der Goltz that pursuant to requirements under the Foreign Account Tax Compliance Act and the Swiss Bank Program run by the DOJ, the bank had undertaken a review of its account relationships and that, in the course of that review, the bank had identified von der Goltz's accounts as "U.S. related" because he was the beneficial owner of the accounts and had U.S. resident status.   (*Id.* ¶ 57).   The Swiss Bank further informed von der Goltz that the bank, in certain circumstances, could be required to report his accounts, and provide his identity, to the United States, and thus encouraged von der Goltz to enter into the IRS's Offshore Voluntary Disclosure Program ("OVDP") and voluntarily report his accounts to the IRS himself.[5]   (*Id.*)

In or about April 2014, von der Goltz retained ███████████ (the "U.S. Law Firm") to assist him with entering into the OVDP.   (*Id.* ¶ 58.).   However, in or about September 2014, instead of entering into the OVDP, von der Goltz filed amended FBARs for the years 2009 to 2013 (the "Amended FBARs").   (*Id.*)   The Amended FBARs filed by von der Goltz, which were prepared by Gaffey and the U.S. Law Firm, were materially false.   (*Id.* ¶¶ 58-59).   Prior to 2014, von der Goltz had annually filed FBARs reporting his interest in two foreign accounts held in his personal name; however, he did not report his interest in any accounts at the Swiss Bank.   (*Id.* ¶ 59).   The Amended FBARs reported that von der Goltz had signature authority, but no financial interest in, the Swiss Bank Revack Accounts.   (*Id.*)   However, as von der Goltz, Gaffey, and

---

[5] The IRS's OVDP was a voluntary disclosure program specifically designed for U.S. taxpayers with exposure to potential criminal liability and/or substantial civil penalties due to a willful failure to report foreign financial assets and pay all tax due in respect of those assets.   As part of their participation in the OVDP, U.S. taxpayers have immunity from criminal prosecution so long as they cooperate fully and truthfully with the IRS and pay all back taxes due, along with interest and penalties.   (*Id.* ¶ 13.)

Owens well knew, von der Goltz was the beneficial owner of those accounts, and he did not actually have signatory authority by design.   (*Id.*)   Accordingly, the Amended FBARs contained false statements that directly contradicted the contents of the account records from the Swiss Bank. (*Id.*)   The Amended FBARs also failed to include other Revack Bank Accounts in which von der Goltz held a financial interest, including the undeclared accounts at ████, a bank in Panama ("Panamanian Bank"), which the Revack Entities nominally held.   (*Id.*)

E.   <u>Von der Goltz's False Statements to the DOJ and Waiver of the Privilege</u>

The so-called "Panama Papers" story broke on or about April 3, 2016, when a global network of investigative journalists disclosed that it had obtained from an unknown source approximately 11.5 million documents of Mossack Fonseca that documented the offshore financial services the firm provided for wealthy clients and public officials.   (*Id.*).   In the wake of public reporting regarding the Panama Papers, in or about early May of 2016, ████, a lawyer with the U.S. Law Firm (the "U.S. Law Firm Representative") contacted the DOJ on von der Goltz's behalf.   (*Id.* ¶ 62).   The U.S. Law Firm Representative indicated that von der Goltz had recently appeared in news reports regarding the Panama Papers and offered to make von der Goltz available for an interview to "correct" the statements that had been made about him in the press. (*Id.*).

On or about May 11, 2016, shortly after contacting the DOJ on von der Goltz's behalf, the U.S. Law Firm Representative followed up with an email, which contended that von der Goltz was "tax compliant," and further stated that "[a]s you google his name, you may find articles."   (*Id.* ¶ 63; *see also* Affirmation of Thane Rehn ("Rehn Aff.") Exhibit A (May 11, 2016 Email from the U.S. Law Firm Representative).   The email also included a "Statement of Facts" which

purportedly described von der Goltz's "situation." (*Id.*; *see also* Indictment ¶ 63).   The Statement of Facts, which was written in the first person with von der Goltz as the speaker, falsely represented, in substance and in part, that (1) upon the death of von der Goltz's father, in 1990, the Mother became the beneficial owner of EMJO and the other Revack Entities; (2) that von der Goltz was not the beneficial owner of EMJO; (3) that he had "signature only" authority over the Swiss Bank Emjo Account; and (4) that he had not used EMJO "to hide funds from the U.S. or other tax authorities." (*Id.*).   The email also attached copies of the materially false Amended FBARs, which von der Goltz had filed in 2014.   (*Id.*).

Approximately one week later, on or about May 19, 2016, representatives of the DOJ interviewed von der Goltz.   (Indictment ¶ 64; *see also* Rehn Aff. Exh. B (May 19, 2016 Memorandum of Interview of Harald Joachim von der Goltz)).   During the interview, which was also attended by the U.S. Law Firm Representative, von der Goltz falsely stated, in substance and in part, that he only had signature authority over the Swiss Bank EMJO Account, and that the Revack Entities were beneficially owned by the Mother.   (Indictment ¶ 64; Exh. B).   Von der Goltz also spoke at length about his relationships with Mossack Fonseca and the Owens Firms, and did not assert the attorney-client privilege over his communications with either firm.   (*See* Exh. B).

On or about March 6, 2017, during a deposition in a civil matter, von der Goltz repeated some of the same false statements that he had made to the DOJ.   (*See* Rehn Aff. Exh. C (Tr. of Mar. 6, 2017 Deposition of Harald Joachim von der Goltz) at 25).   During that deposition, von der Goltz was shown a copy of a New York Times article about him that had been published following the breaking of the Panama Papers news story (the "New York Times Article").   (*See*

*id.* at 8).   Von der Goltz, who was represented by counsel at the deposition, responded to a series of questions concerning the contents of the New York Times Article, including questions about his relationship and discussions with Mossack Fonseca, and did not decline to answer any such questions on the ground of attorney-client privilege.   (*See id.* at 8-30).

### III.     Belated Efforts by von der Goltz to Assert the Privilege

Approximately a year and a half after the U.S. Law Firm contacted the Government and facilitated the false statements made by von der Goltz as described above, Jeffrey Neiman, who was then acting as von der Goltz's counsel, first attempted to invoke the privilege.   Specifically, in a letter to the Government dated November 14, 2017, Neiman contended that von der Goltz, "both personally and in his capacity as advisor to various family entities" was asserting the attorney-client privilege and work product over all of the Relevant Information, in addition to various other materials, and sought to confirm that the "government will put in place proper and thorough taint procedures" in its review of documents from the U.S. Accounting Firm "and any other documents received in this matter."   (*See* Rehn Aff. Exh. D (Nov. 14, 2017 Letter from J. Neiman)).   The parties engaged in further discussions about von der Goltz's claim of privilege and other matters over the subsequent months.   Ultimately, on July 10, 2018, the Government, while reserving its right to argue all other privilege exceptions, informed von der Goltz's counsel by letter that it believed von der Goltz had waived the privilege over the contents of two newspaper articles and the documents published along with those articles, including the New York Times Article, in light of the fact that von der Goltz had spoken at great lengths as to the substance of these articles to a third party and in his civil deposition.   (*See* Rehn Aff. Exh. E (July 10, 2018 Letter from S. Paul)).   In response, Neiman took the position that the privilege had not been

waived.   (*See* Rehn Aff. Exh. F (July 13, 2018 Letter from J. Neiman)).   In light of von der

Goltz's position expressed at that time, a filter team (the "Filter Team") put in place by the

Government to segregate out potentially privileged documents has withheld, in an abundance of

caution, the articles in question, even though many of these documents involved are not privileged.

## IV.   Von der Goltz Disclaims Privilege in the Relevant Information and Waives the U.S. Law Firm Privilege

After von der Goltz was arrested in the United Kingdom and extradited to the United States

pursuant to the charges in the Indictment, the Government met and conferred with von der Goltz's

counsel regarding the Government's position that both the Relevant Information and von der

Goltz's communications with the U.S. Law Firm were not privileged, because of the crime-fraud

exception and because von der Goltz's actions had constituted a waiver of the privilege.   With

respect to the Relevant Information, defense counsel took the position that the privilege belonged

to the Revack Entities, that von der Goltz did not control the privilege, and that he did not know

who was in a position to assert or waive the privilege.   (*See* Dkt. 98 (Tr. of May 29, 2019 Conf.,

at 15-16, 21)).

Defense counsel also initially informed the Government that von der Goltz waived the

privilege with respect to his communications with the U.S. Law Firm in connection with his

amended FBAR filings and his statements to the Government in 2016, and requested additional

time to consider a broader waiver of privilege.   On July 24, 2019, defense counsel informed the

Government that von der Goltz waived the privilege with respect to all communications with the

U.S. Law Firm except to the extent that such advice pertained to defending against the instant

criminal matter beginning when von der Goltz retained criminal counsel on or about June 7, 2016.

Defense counsel informed the Government that von der Goltz was making this waiver because he

may argue that he lacked "*mens rea* with respect to the charges in the indictment because lawyers at [the U.S. Law Firm] were aware of all material facts relating to the pertinent legal, tax, and financial structures of the von der Goltz family" and that they provided him with "legal advice on a variety of topics relevant to his state of mind regarding his tax obligations." (*See* Rehn Aff. Exh. G (July 24, 2019 Letter from D. Koffman)). In connection with this waiver, von der Goltz produced approximately 38,000 pages of documents from the U.S. Law Firm's files.

## V.    The Relevant Information

The Government now seeks a ruling that the Relevant Information is subject to the crime-fraud exception and, additionally, that the attorney-client privilege has been waived with respect to these communications.    The Relevant Information, as noted above, includes all communications and documents for which any claim of privilege is based on the attorney-client relationship between either defendant Harald Joachim von der Goltz ("von der Goltz") or any other person or entity and attorneys at the law firms Mossack Fonseca & Co. ("Mossack Fonseca") and ███████████    or    ███████████    (the "Owens Firms"), to the extent that those communications concern or relate to the Revack Entities, the Revack Trust, or the Revack Holdings Foundation.

The Prosecution Team believes that the Relevant Information is contained (1) in documents withheld by the U.S. Accounting Firm in response to grand jury subpoenas issued to Gaffey and the U.S. Accounting Firm over the course of this investigation; (2) in documents withheld by von der Goltz in response to a grand jury subpoena; (3) in documents seized during the Government's search of the U.S. Accounting Firm on August 8, 2017, but withheld from the Prosecution Team by the Filter Team; (4) in documents received from German law enforcement pursuant to a Mutual

Legal Assistance Treaty Request, but withheld from the Prosecution Team by the Filter Team; and (5) in newspaper articles published in the aftermath of the breaking of the Panama Papers news story, but withheld by the Filter Team, or redacted by the Filter Team before being released to the Prosecution Team.[6]

For the reasons set forth below, the Prosecution Team now seeks a ruling from the Court as to both the application of the crime-fraud exception and the existence of a waiver in this case.[7]

## ARGUMENT

### I.     The Crime-Fraud Exception Applies to the Relevant Information

#### A.   The Applicable Law

The attorney-client privilege applies "(1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or the legal adviser, (8) except the protection be waived . . . ." *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961).   The privilege, however, is not absolute.   "The privilege cannot stand in the face of countervailing law or strong public policy and should be strictly confined within the narrowest possible limits underlying its purpose."   *United States v. Goldberger & Dubin*, 935 F.2d 501, 504 (2d Cir. 1991) (citations omitted).

---

[6] To date, despite their widespread and public dissemination, no member of the prosecution team has read the publicly available Panama Papers containing attorney-client documents relating to the defendants or their fraudulent schemes, or newspaper reporting reflecting any such communications.

[7] The Government expressly reserves its right to assert that documents that have been withheld by the defendants from production to the Government, or withheld by the Filter Team from the prosecution team, are either not privileged or should be made available to the prosecution team on other grounds, beyond those argued herein.

The purpose of the protections accorded attorney-client communications is to facilitate the rendering of sound legal advice; however, because "advice in furtherance of a fraudulent or unlawful goal cannot be considered 'sound,'" it is well settled that the attorney-client privilege does not protect communications that further contemplated or ongoing criminal or fraudulent conduct. *United States v. Kaplan*, No. 02 Cr. 883 (DAB), 2003 WL 22880914, at *7 (S.D.N.Y. Dec. 5, 2003) (quoting *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983,* 731 F.2d 1032, 1038 (2d Cir.1984)).   "The crime-fraud exception thus insures that the secrecy protecting the attorney-client relationship does not extend to communications . . . 'made for the purpose of getting advice for the commission of a fraud' or crime." *In re Richard Roe, Inc*., 68 F.3d 38, 40 (2d Cir. 1995) (quoting *United States v. Zolin*, 491 U.S. 554, 563 (1989)).   Such communications or work-product are not protected "even if the attorney is unaware that his advice is sought in furtherance of such an improper purpose." *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1038.

For the crime-fraud exception to apply, the Government must show that there is probable cause to believe that (1) a fraud or crime has been attempted or committed, and (2) the communications or materials in question were in furtherance of the fraud or crime. *Id.* at 1038. The probable cause standard in this context is "not an overly demanding" one. *A.I.A. Holdings, S.A. v. Lehman Brothers, Inc.*, No. 97 Cir. 4978, 1999 WL 61442, at *5 (S.D.N.Y. Feb. 3, 1999); *In re John Doe, Inc.*, 13 F.3d 633, 637 (2d Cir. 1994) (quoting *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1039).   Rather, a court must find that the communication or document in question was itself in furtherance of the crime or fraud and intended in some way to facilitate or conceal the criminal activity. *In re Richard Roe, Inc*., 68

F.3d at 40.   Thus, to find that the crime-fraud exception applies, a court need only conclude that "a prudent person [would] have a reasonable basis to suspect the perpetration of a crime or fraud, and that the communications were in furtherance thereof." *Danisco A/S v. Novozymes A/S*, 427 F. Supp. 2d 443, 444 (S.D.N.Y. 2006) (citing *In re John Doe, Inc.*, 13 F.3d at 637).

The crime or fraud need not have actually occurred for the exception to be applicable; it need only have been the objective of the client's communication. *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1039.   And the fraudulent nature of the objective need not be established definitively; there need only be presented a reasonable basis for believing that the objective was fraudulent. *Id.*

Once the Government has provided a factual basis for moving forward, the Court then moves to the next step in the process: either (a) undertaking an *in camera* review of the documents at issue, or (b) ordering the production of the documents (assuming that the probable cause requirements have been satisfied without an *in camera* examination); the decision as to whether to proceed with an *in camera* review lies in the discretion of the district court.[8] *See, e.g., United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997); *see also In re John Doe, Inc.*, 13 F.3d at 636 ("*in camera* proceedings may be used to determine whether the [crime-fraud] exception applies to particular communications").   However, in circumstances where "the government has comfortably made a showing of probable cause" that the communications and documents at issue "were in furtherance of a crime or fraud," courts may order the defendants to produce documents

---

[8] To trigger an *in camera* review of materials to support its probable cause showing, the Government need only establish, through non-privileged materials, "a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *In re John Doe*, 13 F.3d at 636 (quoting *Zolin*, 491 U.S. at 572).

that fall within the crime-fraud exception on a categorical basis without *in camera* review.  *See United States v. Tucker*, 254 F. Supp. 3d 620, 625 (S.D.N.Y. 2017) (concluding that *in camera* review was unnecessary due to Government's showing that entire category of attorney-client communications were in furtherance of crime or fraud); *United States v. Kaplan*, No. 02 CR. 883 (DAB), 2003 WL 22880914, at *10 (S.D.N.Y. Dec. 5, 2003) (finding crime-fraud exception applicable on categorical basis to all files seized in search of attorney's office pertaining to clients who were "indicted or convicted of insurance fraud" in connection with attorney's representation of them and deeming *in camera* review unnecessary).[9]

As discussed below, the Government respectfully submits that an *in camera* examination of documents is not necessary here because the Government has satisfied the requirements of probable cause without reference to the specific documents at issue.

B.  Discussion

The Government easily satisfies its burden of showing that documents reflecting Relevant Information were made in furtherance of a fraud or crime and, accordingly, the crime-fraud exception applies.   By itself, the Indictment meets the requirement of showing probable cause of (1) the commission of a crime or fraud by von der Goltz and his agents; and (2) that the

---

[9] In contrast, in *In re 650 Fifth Ave.*, No. 08 CIV. 10934 KBF, 2013 WL 3863866 (S.D.N.Y. July 25, 2013), which was a civil forfeiture proceeding in which no criminal charges had been filed, the court denied the blanket application of the crime-fraud exception.  *See In re 650 Fifth Ave.*, 2013 WL 3863866 at *2 (concluding that Government failed to demonstrate probable cause that crime or fraud had been committed and denying blanket application of crime-fraud exception to every communication between corporate entity and its attorneys, regardless of subject matter, where Government argued that entity's sole purpose was to engage in alleged criminal conduct).  *In re 650 Fifth Ave.* is inapposite here as it was a civil matter and the Court specifically found, as a threshold issue, that probable cause had not been established.  For the reasons described above, probable cause plainly exists here.

communications at issue were made with the objective of furthering the crime or fraud.  With respect to the commission of a crime or fraud element, the Grand Jury, in returning the Indictment, found probable cause that von der Goltz and his agents, including Owens and Gaffey, were engaged in a fraudulent scheme to conceal his assets and income and evade the payment of U.S. taxes, and promoted that scheme through international money laundering.  *See Tucker*, 254 F.Supp.3d at 624 ("[T]he fact that a grand jury issued the Indictment … supports a finding of probable cause that a crime was committed."); *United States v. Levin*, 2015 WL 5838579, at \*4 (S.D.N.Y. Oct. 5, 2015) ("The Grand Jury has returned an Indictment, finding probable cause to charge the defendants with mail and wire fraud. The Government has thus satisfied the first prong of the crime-fraud exception."); *see also Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975) (a grand jury's return of an indictment "conclusively determines the existence of probable cause....").

The relevant allegations in the Indictment also demonstrate probable cause that documents concerning the Relevant Information were made in furtherance of the fraud.   As set forth therein, the centerpiece of von der Goltz's fraud scheme was a series of Mossack Fonseca-created shell companies, the Revack Entities, which he used to hold bank accounts and hide his assets from the IRS.   The Revack Entities were managed by Owens, first while Owens was working at Mossack Fonseca, and later when Owens was working at the Owens Firms, as part of Owens' illegal efforts to help von der Goltz and Gaffey carry out the fraud.    Thus, von der Goltz's communications with his agents, including those at Mossack Fonseca, the Owens Firms, and the U.S. Accounting Firm, about the Revack Entities and their overlying trust and foundation (the Revack Trust and the Revack Holdings Foundation, respectively) were all necessarily in furtherance of von der Goltz's efforts to hide these assets and income derived therefrom from the IRS. *See Cendant Crop v.*

*Shelton* 246 F.R.D. 401, 406 (D. Conn. 2007) (evidence that the defendant had created sham entities to hides his assets from creditors and had used his attorneys "to form and/or operate vehicles for carrying out the fraud" supplied probable cause to order production of all attorney-client documents concerning those entities).

For all the above reasons, the Government has set forth sufficient evidence to allow "a prudent person [to] have a reasonable basis to suspect the perpetration of a crime or fraud, and that the communications were in furtherance thereof." *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1039.   Therefore, the Government respectfully requests that the Court order that the crime-fraud exception applies to all of the Relevant Information at issue.   As set forth above, the Government does not believe that an *in camera* examination of the documents is necessary.   Because the Indictment sufficiently demonstrates probable cause that von der Goltz and his agents, including his representatives at Mossack Fonseca and the Owens Firms, orchestrated a fraudulent scheme to hide his assets and beneficial ownership of those assets from the IRS, and that the communications and documents at issue were made in furtherance of that scheme, further review of documents is not necessary to establish that the crime-fraud exception applies to the Relevant Information.[10]   Rather, the Government respectfully submits that the Court should rule that the crime-fraud exception applies to the Relevant Information, and

---

[10] To the extent the Court finds that the Government has not established the probable cause standards set forth in *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1039, the Government certainly has established the lower threshold of "'a factual basis adequate to support a good faith belief by a reasonable person . . . . that *in camera* review may reveal evidence to establish the claim that the crime-fraud exception applies." *In re John Doe*, 13 F.3d at 636 (*quoting Zolin*, 419 U.S. at 572).   In the event that the Court wishes to review any or all of the Relevant Communications *in camera*, and to the extent that the Filter Team is in possession of those communications, it can provide them to the Court and interface with the Court regarding their substance.

then require von der Goltz, Gaffey, and the U.S. Accounting Firm to produce to the Filter Team any documents they have withheld in response to grand jury subpoenas issued during the course of this investigation; and for von der Goltz and the Filter Team to meet and confer as to what documents from those sources, as well as from the search of the U.S. Accounting Firm, the response from the German MLAT, and the publicly available Panama Papers news articles fall within the scope of the Relevant Information.[11]   To the extent the parties cannot reach agreement as to certain of those documents, the Court may conduct an *in camera* review as to those documents.

## II.     Von Der Goltz Has Waived the Privilege Over the Relevant Information

### A.   The Applicable Law

The attorney-client privilege "must be jealously guarded by the holder of the privilege lest it be waived ... [because] [t]he courts will grant no greater protection to those who assert the privilege than their own precautions warrant."   *In re Parmalat Sec. Litig.*, No. 04 MD 1653, 2006 WL 3592936 at *4 (S.D.N.Y. Dec. 1, 2006) (quoting *In re Sealed Case*, 872 F.2d 976, 980 (D.C. Cir. 1989)).   If a privilege holder wishes to preserve its privilege, "it must treat the confidentiality . . . like jewels—if not crown jewels," *In re Sealed Case*, 877 F.2d at 980, and "zealously protected the privileged materials, taking all reasonable steps to prevent their disclosure."   *S.E.C. v. Lavin*, 111 F.3d 921, 929 (D.C. Cir. 1997) (quoting *Permian Corp. v. United States*, 665 F.2d 1214, 1220 & n.11 (D.C. Cir. 1981)).   Even in circumstances where the disclosure of privileged or protected documents is involuntary, waiver may still result from the disclosure to a third party or public

---

[11] The Government has produced documents to the defendants that have been withheld as privileged by the Filter Team from the search of the U.S. Accounting Firm and the German MLAT Request.

dissemination of documents if the party asserting the privilege fails to take reasonably designed steps to protect and preserve the privilege after the dissemination. *See id.; see also In re Parmalat Sec. Litig.*, 2006 WL 3592936 at *4 (citing *United States v. de la Jara*, 973 F.2d 746, 750 (9th Cir. 1992)). Under those circumstances, factors to be considered in determining whether the party has waived the privilege include "(1) the reasonableness of the precautions to prevent inadvertent disclosure, (2) the time taken to rectify the error, (3) the extent of the disclosure, and (4) an overarching issue of fairness and the protection of an appropriate privilege which must be judged against the care or negligence with which the privilege is guarded." *Clarke v. J.P. Morgan Chase & Co.*, No. 08CIV02400(CM)(DF), 2009 WL 970940, at *5 (S.D.N.Y. Apr. 10, 2009) (quoting *Business Integration Services, Inc. v. AT & T Corp.*, 251 F.R.D. 121, 129 (S.D.N.Y.2008)) (quotation marks and alterations omitted).

When one party attempts to utilize the attorney-client privilege as an offensive weapon through selective disclosure of privileged material to further its case, that party waives the privilege concerning the subject-matter of the disclosed communications. *See Murray v. Gemplus Intern., S.A.*, 217 F.R.D. 362, 367 (E.D.P.A. 2003) (citing *In re Leslie Fay Cos., Inc. Sec. Litig.*, 161 F.R.D. 274, 282 (S.D.N.Y. 1995)); *see also United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("[T]he attorney-client privilege cannot at once be used as a shield and a sword. A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes."); Fed. R. Evid. 502(a) (a subject matter waiver applies if the disclosure was intentional, the disclosed and undisclosed communications concern the same subject matter, and they ought in fairness to be considered together). The decision of whether the waiver of a voluntarily disclosed communication extends that waiver to the wider universe of related but

undisclosed communications depends on fairness.   *See Chevron Corp. v. Salazar*, 275 F.R.D. 437, 446 (S.D.N.Y. 2011) (citing *In re Teleglove Commn'cs Corp.*, 493 F.3d 345, 361 (3d Cir. 2007).

B.  Discussion

In the aftermath of the breaking of the Panama Papers news story in April 2016, von der Goltz took no efforts to protect any attorney-client privileged or work product documents upon which newspaper articles were premised.   Von der Goltz knew that certain of his communications with Mossack Fonesca and his other agents regarding the Revack Entities had been disseminated to the world on a widespread basis.   But rather than zealously protecting his privilege, or taking reasonable steps to prevent their disclosure, von der Goltz made no apparent effort to preserve any privilege he might claim in these communications.   On the contrary, he made the strategic decision to deliberately and voluntarily waive any claim of privilege over the Relevant Information, through his and his counsels' actions and statements.

It is plain that the leaked attorney-client materials were not jealously guarded by von der Goltz after they were disseminated by the press in April 2016. To the Government's knowledge, von der Goltz took no steps to protect these communications or even to assert that they were privileged until more than a year and a half later, in November 2017 when his counsel first raised the issue of privilege in a letter to the Government.   When privileged materials are inadvertently disclosed to a third party or publicly disseminated, mere inaction by the privilege holder can suffice to waive the privilege.   *See In re Philip Servs. Corp. Sec. Litig.*, No. 98 Cv. 0835 (MBM) (DF), 2005 WL 2482494 (S.D.N.Y. Oct. 7, 2005) (client waived privilege when documents were inadvertently disseminated for a period of nine months before he asserted privilege, and he "asserted no objection" when documents were used during a civil deposition during that time

27

period); *Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, No. 93 Civ. 5298 (LMM) (RLE), 1996 WL 944011, at *5 (S.D.N.Y. Dec. 19, 1996) (six-month delay in asserting the privilege after receiving notice of the involuntary disclosure constituted waiver).

Here, von der Goltz's inaction alone constitutes a waiver, but he did not merely fail to act. He took multiple additional affirmative steps to waive the privilege.  Through his attorney, he invited the Government to inspect those very materials, and then selectively used them to concoct a false narrative, in an effort to convince the Government that he had done nothing wrong.  First, he had the U.S. Law Firm Representative reach out to the Government in May 2016 on his behalf in an effort to "correct" the statements that had been made about him in the press.  By affirmatively inviting the Government to "Google" von der Goltz to learn what material was out in the public domain—including material that would obviously be potentially privileged—and asking the Government to interview his client, the U.S. Law Firm Representative deliberately and voluntarily waived any claim of privilege as to the Relevant Information.  *See, e.g., In re Von Bulow*, 828 F.2d 94, 100 (2d Cir. 1987) (concluding privilege had been waived by client's consent to attorney's publication of confidential communications in a book, and his failure to preserve his confidences).

Von der Goltz again took affirmative steps to undermine his claims of privilege when, in May 2016, the Government conducted an interview of von der Goltz, with the U.S. Law Firm Representative present, at his request.  Rather than assert privilege as to information concerning his relationship with either Mossack Fonseca or the Owens Firms, von der Goltz spoke at great length as to his relationships with both.  The U.S. Law Firm Representative and von der Goltz both discussed with the Government, without any assertion of the privilege, the basis for the

Amended FBARs that von der Goltz filed in 2014, with the U.S. Law Firm's assistance.   Then, nearly a year thereafter in March 2017, von der Goltz again discussed the leaked information concerning his finances from the Panama Papers, without any assertion of the privilege over that information, during a civil deposition.

Von der Goltz cannot have it both ways.   He cannot use the privilege as a "shield and a sword" to argue that the leaked materials remain privileged, after he attempted to "select[ively]" discuss their subject matter with the Government for "self-serving purposes."   *United States v. Bilzerian*, 926 F.2d at 1292.   His belated invocation of privilege over a full year from the first time he actively asked the Government to review the Panama Papers regarding his finances and voluntarily made false statements regarding the same—further establishes the gamesmanship in which von der Goltz has engaged.   Based on the fundamentals of fairness, von der Goltz has waived the subject matter of any once-privileged materials within the Relevant Information, in light of his invitation to the Government to view documents that contain privileged materials, his using these materials to set up an interview to advance his own interests, and his subsequent interview where he denied the-then circulating reports about his connection to illegal activity.   *See Clarke*, 2009 WL 970940, at *7 (finding that "issues of fairness weigh in favor of waiver" when defendant's "belatedly raised claim" of privilege forced plaintiffs to alter their trial preparation).

In addition, von der Goltz has waived the privilege in the Relevant Information by his decision to waive the privilege with respect to the U.S. Law Firm in this criminal proceeding.   In making that waiver, von der Goltz stated that he was doing so to argue that he lacked the necessary *mens rea* because the U.S. Law Firm lawyers "were aware of all material facts relating to the pertinent legal, tax, and financial structures of the von der Goltz family," and provided him advice

"relevant to his state of mind" on these issues. (Exh. G).   As the language of this waiver demonstrates, von der Goltz's communications with the U.S. Law Firm are inextricably intertwined with the ownership of the Revack Entities.   The material facts about the von der Goltz family's "legal, tax, and financial structures" necessarily include the way those structures were set up by Mossack Fonseca and the advice provided by Mossack Fonseca regarding those structures.

The attorney-client privilege "cannot at once be used as a shield and a sword." *Bilzerian*, 926 F.2d at 1292.   Applied here, that principle means that von der Goltz cannot put his state of mind at issue with respect to his communications about the Revack Entities with one set of lawyers while attempting to shield his communications on the same topics with another set of lawyers. As in *Bilzerian*, von der Goltz's assertion that his communications with counsel bear on his *mens rea* make his "conversations with counsel regarding the legality of his schemes … directly relevant in determining the extent of his knowledge and, as a result, his intent."   *Id.*

The facts here show that von der Goltz has waived the privilege notwithstanding his current claim that he does not hold the privilege in the Relevant Information and does not even know who the privilege holder is.   The Indictment specifically alleges in detail that von der Goltz is the true owner of the Revack Entities and also alleges that he is the client of Mossack Fonseca with respect to the Revack Entities, which provides probable cause to find that he is the privilege holder for the Relevant Information.   (Indictment ¶¶ 34-42.)   Additionally, von der Goltz's prior actions and statements demonstrate that he was able to invoke or waive the privilege in the Relevant Information.   He freely discussed aspects of the Relevant Information with third parties, including in meetings with the Government and in a civil deposition.   His counsel also wrote a letter to the Government in November 2017 in which he represented that he was in a position to assert the

privilege in the Relevant Information, whether as the privilege holder himself or in his role as an "advisor" to the family entities.   Indeed, in responding to a grand jury subpoena in this case, von der Goltz himself has expressly withheld materials on the basis of Revack's privilege with Mossack Fonseca and continues to do so, which undercuts his current denials of knowledge about who the privilege holder is. Despite the widespread public dissemination of the Relevant Information and the long pendency and public nature of this criminal investigation and prosecution, no other person has come forth to assert the privilege in the Relevant Information. Accordingly, the Court should look to von der Goltz's conduct to determine that he has waived the privilege in the Relevant Information.

## CONCLUSION

For the reasons discussed above, the Government respectfully requests that its motion be granted.

Dated:        August 14, 2019
              New York, New York

                                        Respectfully submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney
                                        Southern District of New York


                                        DEBORAH CONNOR
                                        Chief, Money Laundering and
                                        Asset Recovery Section
                                        Criminal Division


                              By:       _/s Thane Rehn_____
                                        Eun Young Choi and Thane Rehn
                                        Assistant United States Attorneys
                                        Michael Parker and Parker Tobin
                                        Trial Attorneys, Criminal Division