UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                           :

UNITED STATES OF AMERICA          :
                                           :

     - v. -                        :

                                           :

HARALD JOACHIM VON DER GOLTZ,  :     S6 18 Cr. 693 (RMB)
    a/k/a "H.J. von der Goltz,"       :
    a/k/a "Johan von der Goltz,"    :
    a/k/a "Jochen von der Goltz,     :
    a/k/a "Tica,"                      :
    a/k/a "Tika,"                     :
                                           :
                       Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## **GOVERNMENT'S SENTENCING MEMORANDUM**

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York

DEBORAH CONNOR
Chief, Money Laundering and Asset
Recovery Section, Criminal Division

EUN YOUNG CHOI and THANE REHN
Assistant United States Attorneys, United States Attorney's Office, Southern District of New York

MICHAEL PARKER
Trial Attorney, Criminal Division, United States Department of Justice

   -   Of Counsel -

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. ii

I.   PRELIMINARY STATEMENT ................................................................. 1

II.  STATEMENT OF FACTS .......................................................................... 2

   A.   The Defendant ..................................................................................... 2

   B.   The Defendant's Offense and Relevant Conduct ............................... 3

     1.   Von der Goltz's Use of Mossack Fonseca in the Creation and Maintenance of the Revack Entities .................................................................................................. 4

     2.   The Evasion of Von der Goltz's Reporting and Tax Obligations ............................... 6

     3.   Von der Goltz and Gaffey's Efforts to Hide Von der Goltz's Ownership of the Revack Entities by Using the Mother's Identity .................................................................. 10

     4.   Von der Goltz's False Reports of Foreign Bank and Financial Accounts in 2014 .... 11

     5.   Von der Goltz Induces Others to Commit Tax Fraud ................................................ 13

     6.   Payments Made to Gaffey and Other Co-Conspirators, and Further Tax Evasion .... 13

     7.   The "Panama Papers" and von der Goltz's False Statements to the Government ..... 15

     8.   Von der Goltz's Evasion of the Expatriation Tax in 2017 ......................................... 17

     9.   The Investigation and von der Goltz's Failure to Comply with Subpoenas............... 18

III.  THE GUIDELINES RANGE ....................................................................... 20

IV.   APPLICABLE LAW .................................................................................. 24

V.    DISCUSSION ............................................................................................. 26

   A.   Seriousness of the Offense and Related Conduct, Need to Promote Respect for the Law and Need to Provide Just Punishment .......................................................................... 26

   B.   History and Characteristics of the Defendant ................................... 28

     1.   The Letters Filed on Behalf of the Defendant .......................................................... 28

     2.   The Defendant's Charitable Work............................................................................. 31

     3.   The Defendant's Reputation ..................................................................................... 35

     4.   The Effect of the Defendant's Immigration Status.................................................... 37

     5.   The Defendant's Age and the COVID-19 Pandemic ................................................ 40

   C.   The Need to Afford Adequate Deterrence ......................................... 41

   D.   Avoidance of Unwarranted Sentencing Disparities .......................... 46

VI.   ORDER OF RESTITUTION AND FINE ................................................... 49

VII.  CONCLUSION........................................................................................... 50

(i)

# TABLE OF AUTHORITIES

## CASES

*Comm'r v. Banks*,
543 U.S. 426 (2005) ........................................................................................ 23

*Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*,
275 U.S. 87 (1927) .................................................................................... 27-28

*Eisner v. Macomber*,
252 U.S. 189 (1920) ........................................................................................ 23

*Gall v. United States*,
552 U.S. 38 (2007) .......................................................................................... 25

*Garlock Inc. v. Comm'r*,
489 F.2d 197 (2d Cir. 1973) .......................................................................... 23

*Helvering v. Horst*,
311 U.S. 112 (1940) ........................................................................................ 23

*McCullough v. Royal Caribbean Cruises, Ltd.*,
268 F. Supp. 3d 1336 (S.D. Fla. 2017) .................................................... 33, 34

*Molina-Martinez v. United States*,
136 S. Ct. 1338 (2016) ................................................................................... 25

*Pepper v. United States*,
562 U.S. 476 (2011) ........................................................................................ 24

*Sakol v. Comm'r*,
574 F.2d 694 (2d Cir. 1978) .......................................................................... 23

*Spies v. United States*,
317 U.S. 492 (1943) ........................................................................................ 27

*Topsnik v. Comm'r*,
146 T.C. 1 (emphasis added) .......................................................................... 23

*United States v. Ainabe*,
938 F.3d 685 (5th Cir. 2019) ..................................................................... 22-23

*United States v. Bliss*,
430 F.3d 640 (2d Cir. 2005) .......................................................................... 39

*United States v. Booker*,
543 U.S. 220 (2005) ........................................................................................ 25

(ii)

*United States v. Cavera*,
  550 F.3d 180 (2d Cir. 2008)  ................................................................. 25, 37

*United States v. Coppola, 671 F.3d*
  220, 254 (2d Cir. 2012)  ........................................................................... 42

*United States v. Corsey*,
  723 F.3d 366 (2d Cir. 2013)  .................................................................... 26

*United States v. Crosby*,
  397 F.3d 103 (2d Cir. 2005)  ............................................................... 25, 26

*United States v. Cutler*,
  520 F.3d 136 (2d Cir. 2008)  ............................................................... 36, 37

*United States v. Engle*,
  592 F.3d 495 (4th Cir. 2010)  ......................................................... 45-46, 47

*United States v. Ghailani*,
  733 F.3d 29 (2d Cir. 2013)  ...................................................................... 47

*United States v. Hassebrock*,
  663 F.3d 906 (7th Cir. 2011)  ................................................................... 44

*United States v. Heffernan*,
  43 F.3d 1144 (7th Cir. 1994)  ................................................................... 44

*United States v. Hollier*,
  321 F. Supp. 2d 601 (S.D.N.Y. 2004)  ...................................................... 22

*United States v. Johnson*,
  567 F.3d 40 (2d Cir. 2009)  ................................................................ 47, 48

*United States v. Jones*,
  460 F.3d 191 (2d Cir. 2006)  .................................................................... 26

*United States v. Kuhlman*,
  711 F.3d 1321 (11th Cir. 2013)  .......................................................... 37-38

*United States v. Matera*,
  489 F.3d 115 (2d Cir. 2007)  .................................................................... 41

*United States v. McClatchey*,
  316 F.3d 1122 (10th Cir. 2003)  ............................................................... 29

*United States v. Musgrave*,
  761 F.3d 602 (6th Cir. 2014)  ................................................................... 37

(iii)

*United States v. Pica*,
   692 F.3d 79 (2d Cir. 2012) ................................................................. 41

*United States v. Prosperi*,
   686 F.3d 32 (1st Cir. 2012) ............................................................... 37

*United States v. Regensberg*,
   635 F. Supp. 2d 306 (S.D.N.Y. 2009), aff'd, 381 F. App'x 60 (2d Cir. 2010) .................... 29

*United States v. Rioux*,
   97 F.3d 648 (2d Cir. 1996) ................................................................ 32

*United States v. Stefonek*,
   179 F.3d 1030 (7th Cir. 1999) ............................................................. 38

*United States v. Trupin*,
   475 F.3d 71 (2d Cir. 2007) ................................................................ 45

*United States v. Vrdolyak*,
   593 F.3d 676 (7th Cir. 2010) .......................................................... 29, 32

*United States v. Zukerman*,
   897 F.3d 423 (2d Cir. 2018) .......................................................... 27, 44

## STATUTES AND SECONDARY SOURCES

18 U.S.C. § 1028A ................................................................... 49

18 U.S.C. § 3553 ...............................................2, 25, 26, 37, 42, 47

18 U.S.C. § 3661 ................................................................... 24

26 U.S.C. § 877A .......................................... 18, 20, 21, 48, 49

26 U.S.C. § 7206 .................................................................. 48

U.S.S.G. Ch. 2 .................................................................... 43

U.S.S.G. § 1B1.3 .............................................................. 21, 22

U.S.S.G. § 1B1.4 .................................................................. 24

U.S.S.G. § 2T1.1 ......................................................... 22, 23, 27, 44

U.S.S.G. § 3C1.1 .................................................................. 39

U.S.S.G. § 5H1.11 ................................................................. 32

Joshua D. Blank, *In Defense of Individual Tax Privacy*,
   61 Emory L.J. 265, 321 (2011) .......................................................... 43

I.      PRELIMINARY STATEMENT

The United States respectfully submits this memorandum in connection with the sentencing of defendant Harald Joachim von der Goltz, scheduled for September 21, 2020 at 11:00 AM, and in response to defendant's sentencing memorandum filed on July 2, 2020 ("Mem.") (Dkt. No. 225).

For decades, von der Goltz orchestrated a complex fraudulent scheme for the purpose of evading tax payments that he owed to the United States.    He concealed his assets in a network of overseas shell companies and bank accounts created for that purpose, and kept his ownership of these assets secret through an increasingly brazen series of lies to federal tax authorities, financial institutions, and business associates.    He, and the lawyers and accountants he hired to perpetuate the fraud on his behalf, submitted false tax filings to the IRS and created false documents to deceive banks and brokerage houses where he managed his investments.    When the truth began to emerge following the revelations of the Panama Papers in 2016, he personally met with federal law enforcement officers and made false statements about his ownership of these assets, and then made efforts to leave the country permanently before the investigation was complete.    Over the course of the scheme, he evaded paying over three million dollars in taxes he owed.

As discussed in more detail below, the parties have stipulated to a United States Sentencing Guidelines range of either 97 to 121 months' imprisonment or 87 to 108 months' imprisonment, depending on whether the Court finds that von der Goltz's tax evasion related to his expatriation in 2017 should be included in the Guidelines calculation. The Government's position is that the Guidelines Range is 97 to 121 months, and the Government respectfully submits that, given the age and the health of the defendant, a sentence below this range would be appropriate in this case.

1

Nevertheless, a significant incarceratory period is necessary in this case to achieve the goals of sentencing set forth in Title 18, United States Code, Section 3553(a), and the defendant's proposed sentence of time served with one year of home confinement would run contrary to the Section 3553(a) factors.

## II.    STATEMENT OF FACTS

### A.    <u>The Defendant</u>

The defendant was raised in a stable and supportive family environment.   (Presentence Investigation Report ("PSR"), dated June 19, 2020, ¶ 94). He was born into a wealthy family, attended elite private schools throughout his youth, and "experienced no financial difficulties during his childhood" in Guatemala. (*Id.* ¶ 93).   Von der Goltz is highly educated, with a bachelor's degree from MIT and a business certification from the Harvard Business School. He had a long professional career in the lucrative field of private equity. (*Id.* ¶¶ 109-13).

Von der Goltz moved to the United States in 1985, obtaining lawful permanent residency status at that time.   (*Id.* ¶ 98).   For most of the time during which he has lived in the United States, he resided primarily in Massachusetts, in a "6,504 square-foot Colonial-style residence" with an in-house "gym and movie theater" and an "in-ground pool."   (*Id.* ¶ 99).   As discussed below, von der Goltz used funds from the Revack entities to pay off a mortgage on the Massachusetts property.   He also owned a beachfront apartment in Key Biscayne, Florida, where he resided in part.   In October 2017, while under investigation for his tax evasion, von der Goltz renounced his United States residency and left the country, spending most of his time in Guatemala and Germany, two countries from which extradition to the United States would have been difficult or impossible.   He was arrested while passing through London in December 2018.   (*Id.* ¶ 65).

B.    **The Defendant's Offense and Relevant Conduct**

This case involves von der Goltz's efforts to evade the requirements of United States tax laws to report and pay income taxes, including income and capital gains that he received in both domestic and foreign bank accounts.    Von der Goltz sought to evade taxes by holding his assets through a sham entity originally called the "Revack Trust," which in 2007 he resettled into a Panamanian entity called the "Revack Holdings Foundation."    (*Id.* ¶ 17).    Through Revack, von der Goltz held ownership interests in a series of shell companies (the "Revack Entities") and maintained domestic and foreign bank accounts in those entities' names (the "Revack Bank Accounts").    (*Id.* ¶ 18).

This arrangement of holding assets through the Revack Entities and Revack Bank Accounts was designed to hide von der Goltz's ownership of the assets at issue from the Internal Revenue Service ("IRS").    In furtherance of that objective, von der Goltz, and those working on his behalf, including his accountant Richard Gaffey and his Panamanian attorney Ramses Owens, at times falsely claimed that von der Goltz's elderly mother, who is not a U.S. person (the "Mother"), was the sole beneficial owner of the shell companies and accounts.    In truth, von der Goltz himself beneficially owned them, exercised control over them, and used the funds for his own benefit. Furthermore, despite being obligated to do so, for the tax years from 2000 to 2016, von der Goltz fraudulently failed to report the income and capital gains he earned through the Revack Entities, as well as his ownership of the foreign Revack Bank Accounts.    (*Id.* ¶ 19).    Von der Goltz's efforts to hide his ownership of the Revack Entities and the Revack Bank Accounts continued into 2014, when he filed materially false amended Reports of Foreign Bank and Financial Accounts ("FBARs") with the Government, and into 2016, when he caused his attorney to make materially

3

false statements in an email to the Government and repeated the substance of those false statements during an interview with the Government.   (*Id.* ¶ 20).

### 1. Von der Goltz's Use of Mossack Fonseca in the Creation and Maintenance of the Revack Entities

Beginning in the 1980s, von der Goltz used the services of Mossack Fonseca, a Panamanian law firm, to create and maintain the various Revack Entities to hold unreported assets for him in the U.S. and abroad.   (*Id.* ¶ 21).   The Revack Entities were "owned" by the Revack Trust, an overlying trust domiciled in the British Virgin Islands, and later by the Revack Holdings Foundation, a Panamanian entity, both of which were created by Mossack Fonseca (the Revack Trust and Revack Holdings Foundation are referred to collectively herein as "Revack").   The relevant documentation regarding the Revack Trust, the Revack Holdings Foundation, and the Revack Entities, dating back to at least 1988, makes clear that von der Goltz was the primary beneficiary of Revack throughout the relevant time period.

The Revack Trust was initially formed in November 1988, when Ruediger von der Goltz, von der Goltz's father, executed a trust agreement establishing the Revack Trust (the "Revack Trust Agreement").   (*Id.* ¶ 22).   The Revack Trust Agreement, which was written with the assistance of Mossack Fonseca, states that upon the death of Ruediger von der Goltz, the assets in the trust are for the use and benefit of von der Goltz and his immediate family.   The Revack Trust Agreement specifically identifies von der Goltz himself as the Trust's primary beneficiary and his wife and children as secondary beneficiaries.   The Revack Trust Agreement makes no mention of the Mother, from whom Ruediger was estranged, or any of von der Goltz's siblings.   (*Id.*).

After his father's death, von der Goltz, as the primary beneficiary of the Revack Trust, used it to hold assets and make investments to generate income for himself.   (*Id.* ¶ 23).   Throughout

this time period, von der Goltz directed the flow of funds into and out of the Revack Entities, both to make various investments and to use the funds for his personal expenses.   (*Id.* ¶ 24).

Later, in January 2007, von der Goltz used the services of Mossack Fonseca to resettle the Revack Trust into a Panamanian entity named the Revack Holdings Foundation.   (*Id.* ¶ 25).   The assets previously held by the Revack Trust were transferred to the Revack Holdings Foundation. Shortly thereafter, in February 2007, von der Goltz drafted and circulated a "wish list" for the Revack Holdings Foundation, explaining his intention to provide the initial contributions to the foundation as assets to be used for future investments that "fit into [his] philosophy as the founder of this Foundation."   Von der Goltz also made clear that the "Foundation is for the H.J. vdG family and my direct survivors, nobody else," and reserved the right to "change the ratio of the benefits flowing to each of my 3 children at any time," including based on their behavior.   (*Id.*).

In September 2007, von der Goltz executed a document entitled the "Regulations of the Private Foundation Named Revack Holdings Foundation."   (*Id.* ¶ 26).   Consistent with von der Goltz's wish list, the Revack Holdings Foundation Regulations stated, among other things, that the "initial contributions" of assets to the Revack Holdings Foundation were made by "the First Beneficiary (H.J. von der Goltz)," and were to be invested as previously detailed by von der Goltz. And consistent with both the original Revack Trust and von der Goltz's wish list, the Revack Holdings Foundation Regulations name Harald Joachim von der Goltz as the primary beneficiary, and von der Goltz's wife and three children as the other beneficiaries to the Foundation.   Like the Revack Trust Agreement, neither the deed of resettlement nor the 2007 Revack Holdings Foundation Regulations make any mention of von der Goltz's Mother.   (*Id.*).

Other documents establish that the Revack Holdings Foundation, through its various Revack Entities, did in fact make investments of the type described in the Revack Holdings Foundation Regulations, totaling tens of millions of dollars. (*Id.* ¶ 27). For instance, the December 31, 2012 balance sheets for the Revack Holdings Foundation and the Revack Entities— which were maintained by Gaffey at the U.S. Accounting Firm—listed out the entities' various investments, including investments in private equity companies run by von der Goltz, real estate investment companies, and a watch company named Zadora Timepieces. The December 31, 2012 balance sheets further reflect that, as of that date, the assets held and investments made by the Revack Entities had a total value of approximately $35 million. (*Id.*).

### 2. The Evasion of Von der Goltz's Reporting and Tax Obligations

Since at least 2000, von der Goltz has maintained bank accounts held in the names of Revack and various Revack Entities (the "Revack Bank Accounts"). (*Id.* ¶ 28). The Revack Bank Accounts, which include investment accounts as well as checking and savings accounts, have been located both in the United States and abroad, at various financial institutions. At all relevant times, von der Goltz—as the primary beneficiary of Revack, and as a beneficial owner of the Revack Entities—was the beneficial owner of the Revack Bank Accounts. Consistent with his status as the beneficial owner, von der Goltz used the assets in the Revack Bank Accounts for his personal benefit. However, he did not properly report the assets to the IRS or pay the required taxes on income and capital gains generated by the assets. (*Id.*).

In approximately 1999, von der Goltz tasked Richard Gaffey with the management of the assets of the various offshore Revack Entities. (*Id.* ¶ 29). Gaffey effectuated transfers of funds from the Revack Entities at von der Goltz's instruction, including transfers to make investments

on behalf of the Foundation, as well as to fund von der Goltz's various personal expenses (including, for instance, payments for von der Goltz's private airplane, grouse hunting trips to Scotland, and purchases of art).   To facilitate Gaffey's ability to execute such transactions, Gaffey was named an officer for several of the Revack Entities, including an entity named EMJO Investments Ltd. ("EMJO").   (*Id.*).

a.   Domestic Bank Accounts

To conceal von der Goltz's ownership of the Revack Entities, von der Goltz was not listed as a beneficial owner on United States bank accounts.   (*Id.* ¶ 30).   Instead, bank records illustrate that Owens and Gaffey have served as authorized signatories on the domestic bank accounts, and have opened those accounts in a manner that concealed von der Goltz's beneficial ownership.   For instance, documents from Credit Suisse and JPMorgan Chase in New York and First Republic Bank in Boston show that Gaffey and Owens assisted von der Goltz in opening Revack Bank Accounts at these banks, including accounts nominally held by EMJO.   At all relevant times, von der Goltz was the sole beneficial owner of EMJO and all the assets that EMJO held.   However, in connection with the opening of these accounts, Owens (Credit Suisse) and Gaffey (JPMorgan Chase and First Republic) signed IRS forms falsely certifying that EMJO, a foreign shell entity, was the beneficial owner of the accounts and, thus, that the accounts were not subject to U.S. income tax withholding.   As a result, although these accounts held investments which generated millions of dollars in capital gains, no income tax was reported or paid on the gains that were generated.   (*Id.*).

b.   Foreign Bank Accounts

Von der Goltz, with the assistance of Gaffey and Owens, also opened and maintained

7

foreign bank accounts, including at a bank in Switzerland (the "Swiss Bank") and a bank in Panama (the "Panamanian Bank").   (*Id.* ¶ 31).   Unlike the domestic Revack Bank Accounts, the foreign Revack Bank Accounts correctly identified von der Goltz as the beneficial owner of the Revack Entities.   Von der Goltz had a longstanding relationship with the Swiss Bank.   In light of this relationship with the Swiss Bank, in November 2007, von der Goltz, Gaffey, and Owens worked together to open certain Revack Bank Accounts for von der Goltz at the Swiss Bank.   The new accounts were held in the names of Revack Holdings Foundation and EMJO (collectively, the "Swiss Bank Revack Accounts"), respectively, and the funds that had been held in a separate Swiss bank account in the name of von der Goltz's Liechtenstein family foundation, the Andrena Familienstiftung, were transferred into the EMJO account.   (*Id.*).   Of note, the account opening documents identified von der Goltz as the beneficial owner of each of these accounts, but falsely stated that he lived in Guatemala.

In light of the false documentation associated with the Swiss Bank Revack Accounts, which asserted that von der Goltz was a non-U.S. person with the Swiss Bank, von der Goltz was able to receive assets held in the Swiss Bank Revack Accounts without disclosing them as taxable income to the IRS, and then use those assets for his own personal benefit.   (*Id.* ¶ 32).   For instance, on June 14, 2013, von der Goltz received, into his personal bank account at First Republic Bank in Boston, a transfer of approximately $430,000 from the Swiss Bank EMJO Account.   At the time von der Goltz received this transfer of money from the Swiss Bank EMJO Account, he needed the money to pay off an outstanding home equity line of credit ("HELOC") at First Republic Bank.   The money that von der Goltz received was the result of the liquidation of shares in precious metals held in his Swiss Bank Account.   However, because the account was not

8

identified as a U.S. account, no taxes were withheld from the capital gains generated from the sale. Von der Goltz did not, in fact, pay any capital gains taxes on the sale, because with Gaffey's assistance as the return preparer, he filed a Form 1040 for the 2013 tax year that falsely failed to report this money to the IRS.   (*Id.*).

Similarly, in the early 2000s, Gaffey and Owens assisted von der Goltz in opening foreign bank accounts in the names of various Revack Entities at the Panamanian Bank (the "Panamanian Bank Revack Accounts").   (*Id.* ¶ 33).   As with the Swiss Bank Revack Accounts, bank records for the Panamanian Bank Revack Accounts correctly identify von der Goltz as the beneficial owner, but incorrectly state that he is a resident of Guatemala.   Emails, faxes, and bank records show that from at least 2003 to 2016, Gaffey instructed various individuals to wire funds from various Revack Bank Accounts for von der Goltz's benefit.   In some cases, Gaffey used the Revack Bank Accounts to pay von der Goltz's expenses for items such as hunting trips and airplane hangar rentals.   In other cases, Gaffey simply transferred the money directly to von der Goltz's personal bank accounts.   For instance, between 2010 and 2016, von der Goltz received over $1.7 million into his personal bank accounts from foreign and domestic accounts nominally held by EMJO.   (*Id.*).

On von der Goltz's Forms 1040 for the tax years 2000 through and including 2016, von der Goltz falsely and fraudulently failed to report the income and capital gains generated in connection with the domestic and foreign Revack Bank Accounts.   (*Id.* ¶ 34).   He also falsely and fraudulently failed to report his interest in, or signature or other authority over, the foreign Revack Bank Accounts.

**3.      Von der Goltz and Gaffey's Efforts to Hide Von der Goltz's Ownership of the Revack Entities by Using the Mother's Identity**

Over time, and as regulatory changes led to greater financial transparency into overseas financial institutions, von der Goltz, Gaffey, and Owens escalated their efforts to hide von der Goltz's status as the true beneficial owner of the Revack Entities.   (*Id.* ¶ 35).   One method they used was to invent and perpetuate the fiction that von der Goltz's elderly Mother was the true beneficial owner of the Revack Entities.

In one of the earliest examples of this fiction, in 2007, Gaffey worked with Owens and Dirk Brauer, an Asset Manager at Mossfon Asset Management and a charged defendant, to open a brokerage account in the name of EMJO to sell shares of a company called DG FastChannel that was publicly traded on a U.S. stock exchange.   (*Id.* ¶¶ 36, 38).   Prior to the opening of the new brokerage account, several versions of Mossack Fonseca due diligence memoranda drafted by Owens and Brauer identified von der Goltz as the beneficial owner of the Revack Entities, and stated that von der Goltz's "wealth outside of the USA is under Revack Holdings."   (*Id.* ¶ 37).

On April 27, 2007, Gaffey wrote an email asking Owens to open a brokerage account for EMJO so they could liquidate the DG Fastchannel shares.   (*Id.* ¶ 38).   In an email to Gaffey dated June 5, 2007, Owens wrote of the difficulties Mossack Fonseca was having in opening the brokerage account for EMJO.   (*Id.* ¶ 40).   Owens began the email by stating that "I know it is not good to comment this by email," and then informed Gaffey that several U.S. companies had requested the "real and final beneficial owner" of EMJO, "which name, as you know, we cannot disclose."   In this email, Owens used the codename "Mr. T" to refer to von der Goltz, a reference to von der Goltz's lifelong nickname of "Tica."   Owens explained to Gaffey that von der Goltz's passport should not be provided, "as we cannot make a link between Mr. T and EMJO inside the

USA," and suggested providing, instead, the passport of von der Goltz's Mother.   Later that day, Owens and Brauer began to prepare false documents to submit to open the brokerage account, which claimed that von der Goltz's Mother was the beneficial owner of EMJO.   (*Id.* ¶ 41). Mossack Fonseca submitted this falsified paperwork to open the brokerage account.   (*Id.* ¶ 42).

After 2007, Gaffey and von der Goltz began fraudulently using von der Goltz's Mother's name for various purposes, especially when communicating with financial institutions in the United States or conducting transactions that implicated the United States financial system.   (*Id.* ¶ 43).   For instance, between 2013 and 2016 Gaffey submitted bank account opening applications to two banks in New York for EMJO stating that the Mother was the beneficial owner of EMJO and using her name, address, date of birth, and other personal identifying information. In support of their efforts to create a paper trail to support these lies, von der Goltz, Gaffey, and Owens created false documents asserting that von der Goltz's elderly and blind Mother was the beneficial owner of the Revack Entities, and in certain instances had the Mother sign documents falsely attesting to her ownership.   (*Id.*).   At various times, von der Goltz wrote lengthy letters or messages to Gaffey, asserting that certain transfers were being made from the Revack Entities specifically at his Mother's request, in an effort to falsely document that the funds were "gifts" or other transfers that were being made by his Mother to von der Goltz and his associates, including Gaffey.   Von der Goltz, Gaffey, and others also created fake email accounts in von der Goltz's Mother's name, and used these email accounts to send and receive correspondence detailing transactions regarding the Revack Entities that were purportedly made on her behalf.   (*Id.* ¶ 44).

### 4.   Von der Goltz's False Reports of Foreign Bank and Financial Accounts in 2014

On March 4, 2014, the Swiss Bank informed von der Goltz that the bank might be required

to report his accounts to the United States government, and suggested that he enter the IRS's Offshore Voluntary Disclosure Program ("OVDP"), which allowed taxpayers with undeclared assets to report those assets and pay a penalty in exchange for protection from criminal liability. (*Id.* ¶ 45).   After receiving this letter, von der Goltz retained a United States law firm (the "U.S. Law Firm") to assist him with entering into the OVDP.   However, in September 2014, instead of entering into the OVDP, von der Goltz filed amended Reports of Foreign Bank and Financial Accounts ("FBARs") for the years 2009 to 2013 (the "Amended FBARs").   (*Id.*).   The Amended FBARs were prepared by Gaffey, together with the U.S. Law Firm.

These Amended FBARs filed by von der Goltz were materially false in multiple respects. Specifically, they asserted that the reason for the "[d]elinquent" submission of the Amended FBARs was because von der Goltz "learned of previously undisclosed accounts with [the Swiss Bank] for which he had no financial interest.   He had only signature authority."   (*Id.* ¶ 46). However, as von der Goltz and Gaffey well knew—and had known since they opened the Swiss Bank Revack Accounts—von der Goltz was the beneficial owner of those accounts, and held sole "financial interest" in the assets held therein.   Moreover, von der Goltz did not actually have signatory authority, by design.   Accordingly, the Amended FBARs contained false statements that directly contradicted the contents of the account records from the Swiss Bank.   The Amended FBARs also failed to include other Revack Bank Accounts in which von der Goltz held a financial interest, including the undeclared accounts at the Panamanian Bank.[1]   (*Id.*).

_____

[1] The Swiss Bank requested that all of its U.S. customers provide supporting documentation to establish their tax compliance.   Notably, von der Goltz was the only U.S. customer of the Swiss Bank who provided documents, in the form of these false FBARS, that directly contradicted the records of the Swiss Bank.

**5.      Von der Goltz Induces Others to Commit Tax Fraud**

Von der Goltz also referred both of his sons to Mossack Fonseca to establish offshore shell companies in which to hide their income from the IRS.   (*Id.* ¶ 51).   Gaffey, working with Mossack Fonseca and Owens, helped to facilitate tax evasion by von der Goltz's two sons through a variety of means, including by making transfers of funds from von der Goltz to his sons in ways designed to make the transfers appear to be foreign gifts or donations as opposed to taxable income, and paying for maintenance and transactional fees for Mossack Fonseca and Owens out of Revack Entity accounts to maintain offshore accounts for von der Goltz's sons.   For instance, in 2009 and 2010, von der Goltz's younger son received approximately $55,000 in payments from a New York-based metals company, for consulting work, which were sent to Andreas's shell company account at the Panamanian Bank.   (*Id.* ¶ 51).   Gaffey then instructed Mossack Fonseca employees to transfer the funds to Revack Entity accounts at the Panamanian Account, before wiring the money back to the younger son in the United States, falsely claiming that the funds represented a gift from the Mother rather than income earned by the younger son.

**6.      Payments Made to Gaffey and Other Co-Conspirators, and Further Tax Evasion**

In furtherance of the conspiracy, von der Goltz paid his co-conspirators and agents, including Gaffey, for their efforts in helping him manage the Revack Entities.   (*Id.* ¶ 52).   Von der Goltz paid Gaffey in a variety of ways, including through approximately $543,767 in fees paid to the U.S. Accounting Firm at which Gaffey was a partner, as well as payments von der Goltz made directly to Gaffey.   For instance, in August 2007, after the initial public offering ("IPO") of DG FastChannel, which as described above is a company in which von der Goltz had invested through the Revack Entities, von der Goltz made payments to three of his close business associates,

including his elder son, his personal secretary Ingrit Meyer, and Gaffey.

Von der Goltz also paid Gaffey, Meyer, and another close business associate, Charles Bridge, in the form of stock of Exa Corporation, a software company in which von der Goltz invested through the Revack Entities that had an IPO in 2012.   (*Id.* ¶ 53).   As a result of the Exa IPO, several of von der Goltz's companies came to own large amounts of Exa stock, as did von der Goltz personally.   In 2015, von der Goltz gave shares to Gaffey, Meyer, and Bridge. Specifically, Gaffey received 20,000 shares of Exa that had been held by one of the Revack Entities, which were then worth slightly more than $200,000.   Von der Goltz wrote a letter for Gaffey in 2015 that falsely claimed that the shares were a gift from von der Goltz's Mother.

In 2016 and 2017, von der Goltz directed Gaffey to sell his Exa shares, both the shares that he owned personally and the ones he held through the Revack Entities.   (*Id.* ¶ 54).   However, von der Goltz only reported and paid capital gains tax on the shares he held in his own name.   During the same time frame, Gaffey also sold the shares that von der Goltz had given him, and reported the sales as capital gains on his personal tax return.   Voicemails and documents during this time frame establish that Gaffey and von der Goltz agreed that, in order to fraudulently reduce the capital gains tax that would be due from Gaffey and also Meyer and Bridge, Gaffey would inflate the cost basis for the Exa shares.   (*Id.*).   The inflated cost basis figure that Gaffey reported for the Exa shares was in direct contradiction to internal U.S. Accounting Firm records that showed the true cost basis of the shares transferred by von der Goltz from his Revack Entities.   (*Id.* ¶ 55). Because capital gains taxes are paid on the difference between the sale price of the shares and the owner's cost basis, the effect of an inflated cost basis is to reduce the capital gains tax paid when the sale is reported.

      7.      **The Panama Papers and von der Goltz's False Statements to the Government**

On or about April 3, 2016 the "Panama Papers" news story broke. The Panama Papers involved the publication of a large volume of documents disclosed from the internal files of Mossack Fonseca. (*Id.* ¶ 56). It was also widely reported that the Government was investigating Mossack Fonseca and its employees and clients, focusing on U.S. persons who used Mossack Fonseca for purposes of hiding their assets offshore. In May of 2016, after the publication of news stories about the Panama Papers, the U.S. Law Firm continued to represent von der Goltz. A partner at the U.S. Law Firm (the "U.S. Law Firm Representative") reached out to the IRS and this Office on von der Goltz's behalf. (*Id.*). The U.S. Law Firm Representative offered to make von der Goltz—who by then had appeared in news reports regarding the Panama Papers— available for an interview to "correct" the statements that had been made about him in the press, as well as to provide information regarding Mossack Fonseca.

On May 11, 2016, shortly after contacting the IRS, the U.S. Law Firm Representative followed up with an email on von der Goltz's behalf to an Assistant United States Attorney in the Southern District of New York. (*Id.* ¶ 57). This email contained multiple false statements, including that von der Goltz's Mother was the beneficial owner of EMJO and the other Revack Entities, that von der Goltz was not the beneficial owner of EMJO, that he had "signature only" authority over the Swiss Bank EMJO Account, and that he had not used EMJO "to hide funds from the U.S. or other tax authorities." On May 19, 2016, von der Goltz and the U.S. Law Firm Representative met with representatives of the Department of Justice ("DOJ"), including an Assistant United States Attorney and multiple IRS agents. (*Id.*). During that meeting, von der Goltz repeated the false statements that the U.S. Law Firm Representative had made in the U.S.

Law Firm Representative's email, stating that von der Goltz's Mother was the beneficial owner of the Revack Entities and that von der Goltz had signature only authority over the Swiss Bank EMJO Account.

After the Panama Papers story broke, von der Goltz, Gaffey, and Owens continued to work together to paper their false cover story, which asserted that von der Goltz's Mother was the actual owner of the Revack Holdings Foundation.   (*Id.* ¶ 58).   For instance, on May 19, 2016—the same date that von der Goltz met with and made false statements to the Government—Gaffey sent to the U.S. Law Firm Representative a copy of a Form 3520, which is an IRS form that U.S. persons must file to report large gifts from foreign trusts or foreign persons at the same time that they file their tax returns.   The Form 3520 sent by Gaffey purported to be for von der Goltz for the tax year 2013, and listed a $592,287 cash gift from von der Goltz's Mother.   However, von der Goltz and Gaffey had never filed this Form 3520 with the IRS, or any Form 3520s for von der Goltz during the relevant period.   (*Id.*).   Moreover, the Form 3520 was not prepared at the time of von der Goltz's tax filings for 2013.   Rather, the document's metadata reveals that on May 19, 2016, Gaffey created this fabricated and backdated Form 3520, and then sent a copy of it that same day to the U.S. Law Firm Representative.   (*Id.* ¶ 59).

On or about May 23, 2016 a reporter for the *New York Times* began to contact von der Goltz and his agents, including the U.S. Law Firm Representative, for comment on an article that the *Times* intended to run on von der Goltz.   (*Id.* ¶ 60).   In particular, on May 30, 2016, the reporter attached to an email a series of documents that had been found within the "Panama Papers," including copies of the Revack Trust Agreement and the Regulations for the Revack Holdings Foundation, which named von der Goltz as the beneficial owner, and internal Mossack

Fonseca communications which referred to von der Goltz as the owner of the Revack Entities. On June 6, 2016, the *New York Times* published an article identifying von der Goltz as a Mossack Fonseca client, which included copies of the original Mossack Fonseca documents.   On June 7, 2016, von der Goltz sent Gaffey a fax containing copies of documents evidencing von der Goltz's control over the Revack Trust.   Von der Goltz called Gaffey the same day and left a voicemail, stating that he had faxed the Mossack Fonseca documents, and "Unfortunately, with the interview I had with the IRS and the, whatchamacallit, the Justice Department, I think there's some bad issues regarding having lied, so that's of course critical for me now, I'm in real trouble."   (*Id.*). Nonetheless, von der Goltz continued to fraudulently evade reporting his assets and paying his taxes.   (*Id.* ¶ 61).

### 8.      Von der Goltz's Evasion of the Expatriation Tax in 2017

In October 2017, von der Goltz renounced his permanent residency in the United States and began residing primarily in Guatemala.   (*Id.* ¶ 63).   When a United States person with a net worth greater than $2 million expatriates, he is required to pay an expatriation tax, calculated as a percentage of the capital gains he would realize if he sold his assets at the time of expatriation. 26 U.S.C. § 877A.   Von der Goltz was well aware of the requirement to pay an expatriation tax, as he exchanged correspondence with Gaffey and the U.S. Law Firm representative about how to bring his reported net worth below $2 million in connection with his expatriation.   However, von der Goltz did not report his ownership of Revack at the time of his expatriation.   If he had done so, he would have owed $2,037,283.60 in expatriation tax.   (Mem. 44).

9.      **The Investigation and von der Goltz's Failure to Comply with Subpoenas**

The Government served a subpoena on von der Goltz on August 1, 2016, which included a request for documents relating to Revack.   In response to that subpoena, von der Goltz did not produce the actual Revack Trust and Revack Holdings Foundation documents that identified himself as the primary beneficiary, such as the documents that the Government obtained through the search warrant on the U.S. Accounting firm, the U.S. Accounting Firm's subpoena response, and in the Mossack Fonseca files.   Instead, he produced a doctored version of the Revack Holdings Foundation Regulations, in which the Mother's name had been cut and pasted in lieu of his own.

As part of its investigation, the Government has documents that were from the search of the U.S. Accounting Firm files relating to the Revack Holdings Foundation.   These include, among others, a spiral-bound hard copy document entitled "Regulations of the Private Foundation Named Revack Holdings Foundation," dated May 23, 2013 (attached hereto as Exhibit A). Attached to the spiral-bound hard copy regulations was an envelope which held a flash drive (*See* Ex. A at 20), the sole contents of which was an electronic copy of the same May 23, 2013 document.   Emails establish that this document was drafted by Ramses Owens's law firm, and then delivered in hard copy with the flash drive to Richard Gaffey.   This same document also existed on the U.S. Accounting Firm's servers, in electronic form, and was produced by the U.S. Accounting Firm in response to the grand jury subpoena.   The May 23, 2013 document lists von der Goltz as the "First Beneficiary" and "Manager" who made the initial contributions to the Revack Foundation; states that the "Foundation is for the First Beneficiary's (H.J. von der Goltz) family and his direct survivors, nobody else (adopted children or non-family persons can never be

18

beneficiaries)"; and identifies the beneficiaries as von der Goltz, his wife Belle, and his three children. (*See* Ex. A at 2, 7, 9-10).

By contrast, in response to the subpoena von der Goltz produced a document, also bearing the date of May 23, 2013, that purports to be the "Regulations of the Private Foundation Named Revack Holdings Foundation" (attached hereto as Exhibit B).   Importantly, however, this document is a doctored version of the authentic May 23, 2013 document, in which von der Goltz's Mother's name has been physically or digitally cut and pasted in place of his name.[2]   This false document did not exist in the U.S. Accounting Firm files; rather, the U.S. Accounting Firm had the authentic versions of the document described above.   The version produced by von der Goltz in response to the subpoena was apparently created for the purpose of misleading the grand jury and obstructing the grand jury's investigation.

Additionally, on October 30, 2017, a grand jury subpoena was issued to von der Goltz requesting information concerning his Swiss Bank account records.   (*Id.* ¶ 63).   Von der Goltz refused to comply with the subpoena.   The Government moved to compel, and on April 9, 2018, Judge Pauley ordered von der Goltz to provide the responsive Swiss Bank records.   Nevertheless, despite the Court's order, von der Goltz did not produce the Swiss Bank records for more than six

---

[2] Any mentions of von der Goltz have been replaced by references to the Mother, by pasting the Mother's name on top of that of von der Goltz, and by pasting "her" over the gendered pronouns "his"/"him."   In some places, the alteration failed to change the pronoun, resulting in the Mother occasionally being referred to as "him" in the doctored document.   The cut-and-paste job also resulted in the block justification of the document to be noticeably altered.   Attached hereto as Exhibits A-1 and B-1 are versions of Exhibits A and B, in which these changes are highlighted for ease of reference, which highlights altered words as well as areas in which the block justification of the document is noticeably edited in order to accommodate the cut-and-paste editing.   Among these alterations is a floating reference to "his son," which has been erroneously pasted into the right margin of the doctored document.   (*See* Ex. B and B-1 at 7).

additional months, leading the Government to file a motion for contempt of court.   (*Id.*).   In his

sentencing submission, von der Goltz argues that his noncompliance was merely a procedural

device to obtain an appealable order.   (Mem. 44).   That suggestion is inconsistent with his filings

in opposition to the contempt motion, which made no mention of the need for a final order to

appeal the Court's order compelling him to comply.   On the contrary, von der Goltz's opposition

brief falsely asserted that he had "exercised – and continues to exercise – reasonable diligence" to

comply with the subpoena.   On October 15, 2018, Judge Pauley found that von der Goltz's

representations about his attempts to comply were false and granted the Government's motion,

holding von der Goltz in contempt for his failure to comply with the Court's prior order to comply

with the subpoena.   (*Id.* ¶ 64).   Von der Goltz finally complied with the Court's order and

produced the records on December 27, 2018—after his arrest in London.

## III.   THE GUIDELINES RANGE

Von der Goltz pled guilty to the charges in the Indictment without a plea agreement, but

the parties have since reached agreement on most aspects of the Sentencing Guidelines.   (*See* Dkt.

No. 216, Ex. 1).   Specifically, the parties have agreed to most aspects of the base offense level for

each of von der Goltz's crimes, and also that certain enhancements apply, including an

enhancement due to the fact that von der Goltz played a managerial and supervisory role in the

offense, and an enhancement due to the fact that von der Goltz willfully obstructed justice with

respect to the investigation and prosecution of the offenses.   (*Id.* at 6).

The remaining disagreement among the parties relates to whether to include von der

Goltz's evasion of the expatriation tax in the loss amount for the Guidelines.   Von der Goltz takes

the position that his expatriation tax evasion should not be included, which means that the loss

20

amount is $1,411,564 and the resulting guidelines range is 87 to 108 months' imprisonment.   (*See id.* at 4-7; Mem. 44).   The Government's position is that von der Goltz's expatriation tax evasion is relevant conduct, because it is "part of the same course of conduct or common scheme or plan as the offense of conviction."   U.S.S.G. § 1B1.3(a)(2).   Von der Goltz evaded paying over $2 million in taxes by expatriating without declaring his ownership of the Revack Entities, and including that tax evasion brings the loss amount up to nearly $3.5 million and results in a Guidelines range of 97 to 121 months' imprisonment (the "Guidelines Range").   (*See* Dkt. No. 216, Ex. 1, at 4-7).

Von der Goltz's expatriation tax evasion is part of the "same course of conduct" as his income tax evasion from 2000 through 2016.   In both instances, his ongoing scheme to evade taxes was predicated on placing his assets in the nominal ownership of the offshore Revack Entities, and then fraudulently failing to disclose his ownership of those assets to the IRS.   That scheme enabled von der Goltz to evade paying more than $1.4 million on his annual income taxes while he was a lawful permanent resident, and the same scheme also enabled him to evade paying an additional $2 million when he renounced his United States residency.   Indeed, the Sentencing Guidelines expressly state that such an ongoing pattern of tax evasion should be included as relevant conduct.   U.S.S.G. § 2T1.1, Application Note 2 ("In determining the total tax loss attributable to the offense (see §1B1.3(a)(2)), ***all conduct violating the tax laws should be considered*** as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated.") (emphasis added).   The application note goes on to provide, as an example of "conduct that is part of the same course of conduct," a case in which "the defendant uses a consistent method to evade or camouflage income, *e.g.*, … using off-

shore accounts." *Id.* That describes exactly what happened here.

Von der Goltz's sentencing submission attempts to escape this conclusion first by citing to the provision in U.S.S.G. § 1B1.3(a)(1) that certain conduct committed "during the commission of the offense" counts as relevant conduct. Von der Goltz argues that he committed his expatriation tax evasion in 2017, after the charged income tax evasion from 2000 through 2016, and thus that it was not "during the commission of the offense." (Mem. 46). That argument fails. As explained above, the applicable provision here is not U.S.S.G. § 1B1.3(a)(1), but § 1B1.3(a)(2), which includes as relevant conduct all conduct that is "part of the same course of conduct or common scheme or plan as the offense of conviction." Prior courts have made clear that common-scheme relevant conduct need not be committed during the charged time period, and in particular that tax violations outside the charged time period are relevant conduct under this provision. *United States v. Hollier*, 321 F. Supp. 2d 601, 602 (S.D.N.Y. 2004) (including "pre-indictment tax deficiencies" as relevant conduct over defendant's objection); *see also United States v. Ainabe*, 938 F.3d 685, 691 (5th Cir. 2019) (rejecting defendant's contention that the "during the commission of the offense" language from § 1B1.3(a)(1) applies to § 1B1.3(a)(2)).

Von der Goltz also makes the argument that the expatriation tax is not an "income tax," and therefore that his evasion of that tax should not be considered relevant conduct. (Mem. 45). That argument also fails, for two reasons. First, under the tax code, the expatriation tax is a component of federal income tax, as the tax courts have recognized. *Topsnik v. Comm'r*, 146 T.C. 1, 13–14 (U.S. Tax Court 2016) ("As a covered expatriate petitioner is treated as having sold all his property on the day before his expatriation date and is subject to ***income tax*** on the net unrealized gain arising from property deemed sold while he was still a U.S. LPR.") (emphasis

added).[3]    Second, whether or not the expatriation tax is characterized as "income tax" is immaterial to whether von der Goltz's willful evasion of that tax is relevant conduct, as the Guidelines explain that "all conduct violating the tax laws" should be considered as relevant conduct.    U.S.S.G. § 2T1.1, Application Note 2.

Finally, even assuming for the sake of argument that von der Goltz's evasion of the expatriation tax was not relevant conduct, the Court should consider it for purposes of sentencing. All of the defendant's misconduct, whether the subject of criminal conviction or not, should be taken into account by the Court when making its ultimate assessment of the proper sentencing prescription.    *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information" a sentencing court may consider "concerning the [defendant's] background, character, and conduct . . . ."); *Pepper v. United States*, 562 U.S. 476, 480 (2011) ("Highly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.") (citation omitted); *see also* U.S.S.G. § 1B1.4

---

[3] Von der Goltz also cites two Supreme Court cases and a law review article to suggest that the expatriation tax is unconstitutional because it taxes "unrealized" capital gains.    (Mem. 46 (citing *Helvering v. Horst*, 311 U.S. 112 (1940), and *Eisner v. Macomber*, 252 U.S. 189 (1920)).    The standards articulated in those cases have long since been supplanted by subsequent case law, to the point that the Second Circuit has referred to *Eisner* as a "well-known, but often distinguished, decision."    *Sakol v. Comm'r*, 574 F.2d 694, 699 (2d Cir. 1978).    More recent Supreme Court precedent establishes that the definition of "income" in the tax code lawfully extends to "all economic gains not otherwise exempted."    *Comm'r v. Banks*, 543 U.S. 426, 433 (2005).    This definition of income as economic gains clearly includes the substantial capital gains that von der Goltz earned on his undisclosed Revack holdings leading up to his expatriation in 2017, gains on which he willfully failed to pay the expatriation tax.    Von der Goltz's constitutional argument – that it violates the Sixteenth Amendment to impose income tax on capital gains if they have not been "realized" by the taxpayer – has not been accepted by any court and is largely a retread of an argument that the Second Circuit once described as "border[ing] on the frivolous."    *Garlock Inc. v. Comm'r*, 489 F.2d 197, 202 (2d Cir. 1973) (rejecting constitutional challenge to a tax on a shareholder's pro rata share of a controlled foreign corporation's profits, when the income had not been distributed to the shareholder).

("In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law.").

Here, there is no factual dispute that von der Goltz had millions of dollars in assets that he hid from the IRS when he renounced his lawful permanent residency, that he knew about and failed to pay the expatriation tax on those assets, and that the resulting tax loss was more than $2 million from that conduct.   That conduct should be considered as part of the Court's sentencing decision, and when factored into the Guidelines, the resulting range is 97 to 121 months' imprisonment.

## IV.   APPLICABLE LAW

Although the Guidelines are no longer mandatory, they continue to play a critical role in trying to achieve the "basic aim" that Congress sought to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways."   *United States v. Booker*, 543 U.S. 220, 252 (2005); *see also United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").   "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."   *Gall v. United States*, 552 U.S. 38, 49 (2007).   The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion.   *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)). Section 3553(a) further directs the Court "in determining the particular sentence to impose" to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) "the need to provide restitution to any victims of the offense." *See* 18 U.S.C. § 3553(a).

In light of *Booker*, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See Crosby*, 397 F.3d at 111-13. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id.* at 112; *see also United States v. Corsey,* 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence."). Second, the Court must consider whether a departure from that Guidelines range is appropriate. *See Crosby*, 397

25

F.3d at 112.   Third, the Court must consider the Guidelines range, "along with all of the factors

listed in section 3553(a)," and determine the sentence to impose.   *Id.*   In so doing, it is entirely

proper for a judge to take into consideration his or her "own sense of what is a fair and just sentence

under all the circumstances."   *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

## V.   DISCUSSION

Based on the factors set forth in 18 U.S.C. § 3553(a), a sentence that includes a significant

term of imprisonment, but less than the Guidelines Range, is appropriate in this case.

### A.   Seriousness of the Offense and Related Conduct, Need to Promote Respect for the Law and Need to Provide Just Punishment

The sentence sought by the Government is necessary in light of the serious nature of the

defendant's conduct, as well as the need to promote respect for the law and to provide just

punishment.   *See* 18 U.S.C. § 3553(a)(2)(A).

The defendant's calculated and prolonged effort not simply to mislead the IRS, but to do

so on a large scale and to evade millions of dollars in income taxes he personally owed, repeatedly

and for a period of decades, warrants a substantial period of incarceration.   Every tax fraud is

theft from the pockets of every taxpaying citizen of this nation.   The Sentencing Commission

sensibly recognized, however, that the dollar amounts involved in a particular tax fraud provide

an important measure of the seriousness of the offense—both in terms of the defendant's

culpability and the need for deterrence.   As the Commentary to Section 2T1.1 states:

> Tax offenses, in and of themselves, are serious offenses; however, a greater tax loss is obviously more harmful to the treasury and more serious than a smaller one with otherwise similar characteristics.   Furthermore, as the potential benefit from the offense increases, the sanction necessary to deter also increases.

U.S.S.G. § 2T1.1, comment. (Backg'd).    When considering an appropriate sentence in this case, the Court should take into account the substantial dollar amounts involved in this case.

The defendant's conduct in evading his own income taxes and filing false returns warrants a significant period of incarceration.    The Supreme Court has long-recognized that "[t]he United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received."  *Spies v. United States*, 317 U.S. 492, 495 (1943).    A functioning government relies on its citizens and residents to report timely, completely, and honestly all taxes they owe, which is why Congress has made it a criminal offense to file false returns or evade income taxes.    Indeed, as the Second Circuit has recognized, "tax crimes represent an especially damaging category of criminal offenses," which "strike at the foundation of functioning government."   *United States v. Zukerman*, 897 F.3d 423, 427 (2d Cir. 2018) (quotation marks omitted); *see generally Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) ("Taxes are what we pay for civilized society. . . .") (Holmes, J., dissenting).

The defendant's personal tax evasion cost the U.S. Treasury more than $3.4 million in actual losses.   Moreover, this loss is further aggravated by the *manner* in which the defendant carried out his evasion.   The defendant's theft of over $3.4 million from the U.S. Treasury was not a one-time mistake or a fleeting lapse in judgment.   Rather, repeatedly and over the course of decades, the defendant made a conscious and deliberate choice to defraud the Government, taking numerous steps to accomplish his evasion, including setting up offshore companies, opening offshore bank accounts, falsely stating on multiple tax filings that he had no interest in any offshore bank account, and falsely telling the Government that he had no interest in the offshore companies.

27

It also involved recruiting his family members to join him in their own tax evasion.   This prolonged and serious criminal conduct warrants a significant term of incarceration.

### B.    History and Characteristics of the Defendant

Unlike many of the defendants who appear before this Court, the defendant enjoyed significant financial stability and comfort as an extremely well-educated, talented, and successful professional—an advantage most people can only dream about.   But it wasn't enough.   The defendant's sentencing submission makes clear that he was a sophisticated and successful businessman.   Despite his financial success in life, he chose to put that sophistication to work to engage in a complex scheme to evade millions of dollars in taxes that he personally owed.    This was a crime driven by greed, not necessity.

### 1.    The Letters Filed on Behalf of the Defendant

The defendant has submitted a number of letters attesting to his positive personal qualities and expressing support.    It is, of course, appropriate for the Court to take these letters into account in connection with sentencing.    However, these attestations to the defendant's positive qualities do not distinguish him from the typical defendant in a white-collar case.    As Judge Marrero observed in another case, this collection of letters

> falls into a pattern advanced by a subset of the white collar criminal.    This category encompasses a select class: distinguished, reputable, highly esteemed model citizens such as this defendant.    The list of their achievements and virtues is long and impressive.    Let  us count the ways.    At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners.    To their community's charities and public causes they are generous patrons and sponsors.

*United States v. Regensberg*, 635 F. Supp. 2d 306, 308 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2d Cir. 2010); *see also United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003)

("excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her"); *United States v. Vrdolyak*, 593 F.3d 676, 682-83 (7th Cir. 2010) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts," and the defendant "should not be allowed to treat charity as a get-out-of-jail card" (citation and internal quotation marks omitted)).   The Government does not question that von der Goltz is a talented, accomplished, and influential person who has helped many others in his career.   But these positive qualities, while admirable, do not set von der Goltz apart from other similarly situated white-collar defendants—individuals who, although high-achieving and successful in their fields, nonetheless choose to steal and defraud, and to hide that side of themselves, as von der Goltz did, from their family, friends, and colleagues.

In addition, many of the acts raised by the letters can be explained by von der Goltz's self-interest.   No doubt von der Goltz has been generous with his friends and business acquaintances, financing among other things annual week-long hunting trips in Scotland (Mem. A053, A119); "intimate" dinners at the Isabella Stewart Gardner Museum at the Fenway in Boston (Mem. A003); a lavish gala for von der Goltz's 70th birthday in Costa Rica, with his son Andreas (Mem. A008, A086); hosting at his enormous mansion in Massachusetts (Mem. A002, A062, A078, A132). These are friends that he has met over the years who, like him, are from wealthy European and Latin American backgrounds, or who met him while attending or funding some of the prestigious private academic institutions he attended in the United States.   But his generosity to these friends should be placed in context.   Von der Goltz was a private equity manager who was in constant

need of investors for his various funds.   He hosted hunting trips, opulent dinners, and other social events in no small part to further his own business interests, and his efforts were successful, as evidenced by the fact that several of the letters are from individuals who helped run his ventures (e.g., Michael Collins, Christopher Nagel, Jack Shields, Charles Bridge, David Kronfeld, Donald Steiner, Stephen Remondi, and Bill End) or invested in them (e.g., Heidi Eckes-Chantre, Harald Lamotte, Christop Prinz zu Schleswig-Holstein, Alejandro Santo Domingo, Frederick Beinecke, Arnoldo Kuestermann, and Arend Oetker).

Moreover, many of the individuals noted in the letters were used by von der Goltz in furtherance of his efforts to maintain the illusion that the Revack Foundation was a true functioning endeavor, owned by the Mother, rather than a vehicle for von der Goltz to evade taxes.   For instance, Ingrit Meyer (Mem. A007) was von der Goltz's long-time secretary, who knew that von der Goltz had complete control of the Revack entities.   She helped facilitate transfers and payments made from the various Revack accounts for years while she worked for him.   Both she, as well as Charles Bridge (Mem. A006), von der Goltz's longtime business partner, directly benefited from the scheme through "gifts" of stock made by von der Goltz from Revack Entities.

As another example, von der Goltz appointed Alejandro Santo Domingo (A 136), a Colombian-American billionaire financier, as an "advisor" to the Revack Foundation; Santo Domingo himself is the individual referred to in the Indictment as the "Investment Advisor," who met with others in London in November 2014 at a meeting of the Revack Holdings Foundation. (*See* Indictment ¶¶ 60, 61).   At that London Meeting, Ramses Owens gave a Powerpoint Presentation in which he proposed that, upon the death of the Mother, the Revack Holdings Foundation would be restructured so that Owens—who was not a U.S. person, and thus not a

30

taxpayer—would own and control the funds, so that von der Goltz and his children could evade paying taxes on the earnings of the Revack Holdings Foundation.   (Indictment ¶ 60).   Once hearing of this proposal, Santo Domingo took von der Goltz aside to express his belief that restructuring the foundation in a manner as proposed by Owens, where Owens served as a straw beneficial owner, would be illegal in the United States.   (Indictment ¶ 61).   However, that was precisely what von der Goltz had been doing for decades prior: using his own mother as a straw beneficial owner of the Revack entities so he could fund his various investment endeavors and maintain his lavish lifestyle, tax free.

The defendant also argues that his "first priority" is his family and friends. (Mem. 18). One of the aggravating factors of his crimes, however, is the degree to which he implicated his family in them.   As noted, the defendant induced each of his two sons to set up tax shelters of their own using Mossack Fonseca.   He also used his elder son to administer the Revack entities and execute transactions for his benefit before Gaffey became more deeply involved, and he used his daughter to open bank accounts for Revack entities at the United States banks where she worked, and to transmit false documents to the banks to conceal his ownership of those accounts. Von der Goltz was more than willing to put his own children at risk of serious legal and professional consequences in furtherance of his overarching tax evasion scheme.

### 2.      The Defendant's Charitable Work

The defendant further argues his "philanthropic pursuits" are a basis for a variance from the Guidelines Range.   However commendable they may be, these acts are unexceptional and insufficient to warrant a below-Guidelines sentence.   *See* U.S.S.G. § 5H1.11 ("Civic, charitable, or public service; employment-related contributions; and similar prior good works are not

ordinarily relevant in determining whether a departure is warranted."); *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (noting that "[i]n extraordinary cases . . . a district court may downwardly depart when a number of factors that, when considered individually, would not permit a downward departure, combine to create a situation that 'differs significantly from the "heartland" cases covered by the guidelines'" (quoting U.S.S.G. § 5K2.0 cmt.)).[4]

The defendant's own description of his "philanthropic pursuits" demonstrates that they are not exceptional.   He first cites his investment in Rain Forest Adventures, a company that operates an aerial tram service in certain Caribbean islands.   (Mem. 11-13).   However, Rain Forest Adventures is and has always been a for-profit company, not a charitable enterprise, and von der Goltz's records make clear that he viewed it as a potentially lucrative investment. (*See, e.g.,* Revack Holdings Foundation Overview of Investments October 31, 2014 (attached hereto as Exhibit C) (noting Revack's 29% ownership interest in Rain Forest Adventures, with initial investment of $4,800,000, and an estimated net value of $7,340,000)).   Moreover, the history of Rain Forest Adventures is actually a dramatic illustration of how von der Goltz has used the Revack scheme not only to defraud the United States of tax revenue, but also to defraud other creditors, including tort claimants.

Specifically, in 2015, a woman who was participating in an excursion in a park operated by Rain Forest Adventures fell to the ground from a fifty-foot-high platform because she was "not

---

[4]  In *Rioux*, the Second Circuit concluded that the district court did not abuse its discretion when it concluded that the combination of the defendant's serious physical impairment, consisting of kidney disease and bone disease, and his charitable acts warranted a variance.   *Id.*   This case offers no such compelling basis for a variance.   *United States v. Vrdolyak*, 593 F.3d 676, 683 (7th Cir. 2010) (charitable contributions "must be exceptional before they will support a more-lenient sentence").

properly secured" by park employees. *McCullough v. Royal Caribbean Cruises, Ltd.*, 268 F. Supp. 3d 1336, 1341 (S.D. Fla. 2017).   A subsequent investigation revealed that the Rain Forest Adventures park had "deviated from proper protocol" in order "to save time on a busy 'cruise day,'" and that "emergency medical technicians were not on site as advertised by the Park in its marketing brochures." *Id.*   The victim sustained a broken neck, broken leg, punctured lung, and permanent paralysis from the chest down, among other injuries. *Id.*   The victim and her husband filed suit against von der Goltz, Rain Forest Adventures, and EMJO, the Revack Entity through which von der Goltz owned his share of Rain Forest Adventures, as well as other defendants, seeking compensation for her injuries.

In defending against the suit, von der Goltz repeatedly perjured himself, falsely denying that he had an ownership stake in EMJO both in a deposition and in sworn responses to interrogatories. *See* Dkt. No. 111, Ex. C (transcript of von der Goltz deposition); *McCullough v. Royal Caribbean Cruises, Ltd.*, No. 16 Civ. 20194 (S.D. Fla. 2016), Dkt. No. 226-3 (von der Goltz's false sworn interrogatory responses).   The district court in Florida specifically cited and relied on von der Goltz's false statements to dismiss the claims against EMJO for lack of personal jurisdiction. *McCullough*, 268 F. Supp. 3d at 1347-49.   At the time, shortly before von der Goltz expatriated, EMJO had substantial assets (of which von der Goltz was the owner) that could have been used to at least partially compensate the plaintiffs.   Ultimately, the plaintiffs obtained a $66 million default judgment against Rain Forest Adventures and von der Goltz in his personal capacity, which they have been largely unable to collect. *McCullough*, No. 16 Civ. 20194, Dkt. No. 436 (S.D. Fla. July 13, 2018).   This history, involving operation of an undercapitalized tourism company through a series of shells, which are then used to perpetrate a fraud on the court

and ultimately denial of recovery to a tort claimant, is hardly worth trumpeting as a basis for a reduced sentence.

Von der Goltz's sentencing submission also refers to his donations to the Fundacion de Ojos in Guatemala.   However, it must be noted that von der Goltz aimed to use his donations to this organization to bolster his false claim that his elderly, blind mother was the true owner of the Revack Foundation.   For instance, on June 2, 2016, as he was facing scrutiny due to the Panama Papers story, von der Goltz left Gaffey a voice message asking specifically to "see what benefits my mother received from Revack or one of the companies, obviously, over the years.   I mean, I know that, for example, for the eye clinic we paid quite a bit of money, probably a couple hundred thousand dollars over the years, which obviously demonstrates that she was the beneficiary." (attached hereto as Exhibit D (transcript of June 2, 2016 voicemail)).   The pattern and timing of payments from von der Goltz to the eye foundation indicate that he made payments to the charity to create a false paper trail in support of his fraudulent claim that his blind mother, and not he, was the owner of the Revack Entities.

Von der Goltz's sentencing submission claims that, between 2010 and 2012, von der Goltz and his Mother donated approximately $350,000 to the Eye Foundation.[5]   (*See* Mem. A109). However, after the Panama Papers story focused attention on his false claim that his Mother owned

---

[5] It is unclear what amount of these earlier purported donations are attributable to von der Goltz. The Government has only been able to find a record of a single $15,000 payment on June 2, 2010 from an EMJO bank account to Arturo Roberto Quevedo, the founder of the clinic and von der Goltz's friend from preparatory school.   The Government has asked von der Goltz's counsel for additional information, and they have responded that there are no additional records from the Eye Clinic to document the claimed amount, but that some of the payments may have been made to third parties by von der Goltz on the clinic's behalf.   Von der Goltz's counsel has not identified any such payments to the Government.

34

Revack, on May 11, 2017, July 7, 2017, and June 6, 2018, von der Goltz made a series of donations

from the EMJO bank account to the clinic, in the amounts of $134,700, $100,000, and $100,000,

respectively.   The fact that von der Goltz did not make any donations from 2012 until 2017

indicates that, just as he said in his voicemail to Gaffey, he in part timed these subsequent donations

to "demonstrate[]" that his Mother was the "beneficiary" of these accounts.   (*See* A109).

Finally, the fact that the defendant was even able to contribute at most $700,000 to this

charity between 2010 and 2018 no doubt resulted in some measure from his unlawful failure to

pay at least $3.4 million in taxes during that same period.   Put simply, the defendant should not

be rewarded for giving a relatively modest share of his wealth to charity at the same time that he

derived a much larger sum in criminal proceeds and evaded his own tax obligations.

### 3.        The Defendant's Reputation

Von der Goltz also contends that his humiliation and loss of social or professional standing

as a result of his guilty plea warrant a lighter sentence.   (Mem. 2-3).   However, the Second Circuit

has rejected this reasoning.   In *United States v. Cutler,* 520 F.3d 136 (2d Cir. 2008), the district

court

> ruled that although the seriousness of [defendant's] offense would ordinarily
> warrant a prison term, [defendant] had already received "'just punishment for the
> offense" because of "the public nature of the prosecution, the public humiliation
> that the defendant has suffered, the loss of his law license and various other
> consequences, and the certainty of prosecution.'   The court also found that these
> factors were sufficient to accomplish 'deterrence in the general sense.'

520 F.3d at 170 (citations to sentencing transcript omitted).   The Second Circuit's response was

blunt:   "As a matter of law and reason, we cannot agree."   *Id.*

The Circuit then noted in *Cutler* that "the consequences listed by the court are hardly

unusual.   An attorney convicted of a felony usually loses his license to practice law.   The

imposition of a light sentence on this basis is not within the court's discretion." *Id.* (citing *Koon*

*v. United States*, 518 U.S. 81, 110 (1996)).   The Circuit also wrote:

> Nor is it unusual for a person convicted of participating in a conspiracy to perpetrate massive frauds to be publicly prosecuted and suffer public humiliation. Those are consequences generally suffered by anyone accused and convicted of a crime, especially a crime involving frauds causing losses of more than $100 million. Thus, the imposition of a nonincarceratory sentence on the basis that a defendant has suffered sufficiently simply because he was prosecuted and convicted would create unwarranted disparities among similarly situated defendants.
>
> Finally, the circumstances referred to by the district court do not constitute punishment.   The public nature of criminal prosecutions is part of our constitutional fabric; the public humiliation suffered by one prosecuted and convicted of a crime is an ordinary consequence of his conduct, not a condition imposed by the criminal codes or the judicial process.   These circumstances, though adverse, are not what § 3553(a)(2)(A) means by "punishment."   Hence they cannot properly be viewed as fulfilling the need for the imposition of just punishment.   And given that the more massive a fraud, the more likely it is that the prosecution will generate publicity, the logical extension of the district court's view—*i.e.,* that [defendant's] public humiliation and the public nature of his prosecution were punishment enough—would mean that the more flagrant the crime, the less actual statutorily prescribed "punishment" it would require.   And of course, the less punishment that is meted out, the less deterrent effect the sentence will have on others contemplating similar crimes.

*Id.* at 171;[6]  *see also United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("It is impermissible

for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants

because it reasons that white-collar offenders suffer greater reputational harm or have more to lose

---

[6] After it decided *Cutler*, the Second Circuit held that when reviewing what is sufficient to meet the § 3553(a) considerations in any particular case "we will not substitute our own judgment . . . [w]e will instead set aside a district court's *substantive* determination only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (citation and internal quotation marks omitted).   The *Cavera* court then wrote:   "To the extent that our prior cases may be read to imply a more searching form of substantive review, we today depart from that understanding," and cited *Cutler* at pages 164 and 167.   *Id.* (footnote omitted).   The Circuit has not, to the Government's knowledge, questioned the logic of the portions of *Cutler* quoted above.

by conviction."); *United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) (vacating non-incarceratory sentence and remanding because "the district court relied heavily on the fact that Musgrave had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life.  '[N]one of these things are [his] sentence.  Nor are they consequences of his sentence'; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment." (citation omitted)); *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status.").

> [N]o "middle class" sentencing discounts are authorized.  Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity.  It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class.  But in this instance we must fight      our nature.  Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (citation omitted).

### 4.    The Effect of the Defendant's Immigration Status

To be clear, von der Goltz was a lawful permanent resident when he was publicly linked to the Panama Papers in 2016.  Knowing that the false statements he repeatedly made to the Government would be proven false by the four corners of the documents being published, von der Goltz began to make preparations to renounce his status and leave the country, including by making transfers of his assets to a trust held by his children so as to avoid any expatriation tax. He renounced his status in October 2017 while in Germany, stating he resided at his mother's home in Guatemala.   From that point, he resided abroad, traveling between Guatemala, Germany,

and elsewhere until his arrest in London on December 3, 2018.   Von der Goltz no doubt knew that Guatemala and Germany would be countries from which it would be impossible for U.S. authorities to extradite him on tax charges, in light of his Guatemalan and German citizenship status.   He was only ultimately apprehended in London after his plans to travel to Costa Rica from Germany were interrupted due to the Government's attempt to alert the Costa Rican authorities to his travel.   Unlike Gaffey, von der Goltz relied upon the fruits of his fraud to avoid justice by renouncing his legal permanent residency and exiting the country while the investigation was ongoing, leaving behind his wife and his children.   As recognized in the Guidelines, a defendant's avoidance or flight from arrest "may warrant a greater sentence within the otherwise applicable guideline range."   U.S.S.G. § 3C1.1, App. Note 5; *United States v. Bliss*, 430 F.3d 640, 651 (2d Cir. 2005).

While it is certainly true that, by consenting to extradition and entering his guilty plea, the defendant has saved the Government resources that otherwise would be devoted to his trial, his knowing misstatements to the Government, his refusal to produce documents in his possession and control to the Government, his concealment of assets to avoid the expatriation tax, his flight from prosecution in 2017, and his guilty plea only on the eve of trial, resulted in the expenditure of considerable resources in seeking to bring him to justice.   Those decisions contribute to the need for a significant sentence.

Von der Goltz's arguments regarding where he would be designated by the Bureau of Prisons if he were sentenced to an incarceratory term, and the type of treatment he would receive because he is a non-citizen by both BOP and Immigration and Customs Enforcement, are based on inferences drawn from various BOP documents.   (*See generally* Mem. 29-31).   The

Government has conferred with both BOP and ICE, and it appears that the inferences drawn by von der Goltz in his submission are not accurate.   For instance, von der Goltz asserts he would be designated to a "privately run, for-profit prison facility," relying on a 2018 BOP memorandum. (*See id.* at 30 (citing Memo from F. Lara, Increasing Population Levels in Private Contract Facilities (Jan. 24, 2018) (Def. Ex. 9))).   The memorandum, however, documents that certain inmates, including male, non-U.S. citizens "assigned to a medical and mental health care level 1 or 2," were to be designated for "transfer consideration" to a private contract facility."   (Def. Ex. 9).   Von der Goltz would likely not be assigned to care level 1 or 2, but rather care level 3, in light of the health concerns that he describes, which would mean he would not be considered for transfer.   *See* Federal Bureau of Prisons Clinical Guidance, Care Level Classification for Medical and Mental Health Conditions or Disabilities, May 2019, at 2-3, *available at* https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf (describing care level 3 as "outpatients who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalizations or complications").   But in any event, the memorandum does not mandate any such transfer for any inmate; rather, if von der Goltz met the criteria at issue, he would simply qualify to be considered by BOP for such a transfer.

Similarly, von der Goltz's argument that he would face additional time in immigration detention upon conclusion of his sentence is not well founded.   The Government has proposed that von der Goltz consent to a Judicial Removal Order that would ensure that he would be immediately deported upon completion of his sentence.   The parties are still discussing this issue. ICE has represented to the Government that if von der Goltz consents to removal, there will be no

need for any removal proceeding at the conclusion of his sentence, which would minimize the length of any ICE custody required to arrange for his transit out of the country.

Finally, it is worth noting that the Court's consideration of this argument would lead to a nonsensical benefit bestowed onto von der Goltz that is not available to Gaffey, whereby non-citizens would receive more favorable treatment than citizens, even for identical tax crimes.   Von der Goltz lived in the United States from the 1980s until his 2017 departure as a legal permanent resident; his wife, two of his children, and all of his grandchildren are citizens.   Despite being eligible for citizenship, he did not choose to obtain it, and thus continued to rely upon his German and Guatemalan citizenship.   This no doubt proved convenient to von der Goltz when applying for foreign bank accounts in his name for his offshore entities, using his Mother's Guatemalan address, in that he could attempt to assert that he was not a U.S. person.   Absent his knowledge that the Government was actively investigating his crimes, von der Goltz would have continued to reside in the United States where he had long lived as a permanent resident.

### 5.     The Defendant's Age and the COVID-19 Pandemic

The defendant's sentencing submission relies heavily on his age and health conditions to argue for a non-incarceratory sentence.   To be sure, the Government acknowledges that it would be reasonable for the Court to take the defendant's age and health into account, and because of this, concedes that a sentence below the Guidelines Range is warranted here.   However, von der Goltz's age and health are just some of the characteristics for the Court to consider, and these factors in and of themselves should not outweigh the other 3553(a) factors that counsel in favor of a substantial term of incarceration in this case.   *See, e.g., United States v. Matera*, 489 F.3d 115, 123 (2d Cir. 2007) (affirming 25-year sentence imposed on 65-year-old defendant when district

40

court found that the other 3553(a) factors outweighed the defendant's arguments about his age and health); *United States v. Pica*, 692 F.3d 79, 89 (2d Cir. 2012) (affirming 108-month sentence imposed on 75-year-old defendant).  Indeed, it would be a perverse result for a defendant to successfully evade criminal prosecution for years due to the secretive nature of his crimes, reap the benefit of those crimes until old age, and then cite his old age as a reason to escape incarceration altogether.  The defendant "knew full well when [he] committed [him]self to a life of crime that if and when [he] finally got caught [he] would be held accountable and [he] should be held accountable."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012) (quoting district court's statement at sentencing and affirming imposition of 16-year sentence running consecutive to 42-month sentence despite 63-year-old defendant's arguments about his age and health).

The Government also acknowledges that von der Goltz's age and health conditions place him at a heightened risk of serious illness due to the COVID-19 pandemic that is currently ongoing. However, the Court has other mechanisms for dealing with this than simply declining to impose a term of incarceration.  As of the time of this writing, it appears that COVID-19 conditions have improved in the federal prison system since the initial outbreak, and it is unknown what conditions will be in the United States generally and in the federal prisons in particular at the time of sentencing, much less at the time of the defendant's surrender date.  The Government has consented to extensions of surrender dates for other defendants in recent months, and acknowledges that a delay in von der Goltz's surrender date may be warranted in the future if conditions at the time warrant it, but no such decision need be made at this time.

## C.   The Need to Afford Adequate Deterrence

The sentence sought by the Government is also necessary here to "afford adequate

deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). General deterrence is particularly important in cases like this because it is essential to reducing the ever-increasing amount of money lost each year through tax fraud. A recent IRS study of tax compliance estimates that only 83.1% of individuals are compliant with their tax obligations, leaving a yearly tax gap of over $458 billion dollars in unreported and uncollected taxes.[7] This means that hundreds of billions of dollars are lost every year because people like the defendant choose to shirk their responsibilities as taxpayers. Put bluntly, meaningful sentences must be given in cases such as this to forewarn others of the consequences for engaging in multi-year tax fraud. *See* Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 Emory L.J. 265, 321 (2011) ("Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect.").

Indeed, the importance of affording general deterrence through meaningful sentences is particularly acute in criminal tax cases. As a result of the significant resources required to mount a criminal tax prosecution, such prosecutions are relatively rare. As the Sentencing Commission explained:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

---

[7] *See* "Tax Gap Estimates for Tax Years 2008-2010," April 2016, *available at* www.irs.gov/pub/newsroom/tax%20gap%20estimates%20for%202008%20through%202010.pdf .

U.S.S.G. ch. 2, pt. T, introductory cmt.   Where the incidence of prosecution is lower, the level of punishment must be higher to obtain the same level of deterrence.   Moreover, the need for general deterrence is greatest in cases involving particularly lucrative and difficult-to-detect tax fraud schemes, such as schemes like the defendant's that use offshore companies.   As the Commentary to Section 2T1.1 states:

> Although tax offenses always involve some planning, unusually sophisticated efforts to conceal the offense decrease the likelihood of detection and therefore warrant an additional sanction for deterrence purposes.

U.S.S.G. § 2T1.1, comment. (Backg'd); *see also Zukerman*, 897 F.3d at 429 (finding "eminently reasonable" district court's findings that general deterrence "has a particularly important role" due "to the significant resources required to monitor and prosecute tax crimes," which "cost the government hundreds of billions of dollars annually") (quotation marks omitted); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011) (affirming as reasonable a within-Guidelines 32-month sentence for a tax evader when the district court explained that "a sentence of probation would not promote respect for the law, but encourage people to flaunt it").   Thus, in order to provide adequate general deterrence, sentences for multi-year tax fraud schemes must be substantial.

The defendant's request for a sentence of time served and home confinement of one year— to be served in a multi-million dollar estate in which the defendant lived for years—would fail to serve the goal of general deterrence.   The message that would be sent to the community by such

a sentence is that tax fraud is insignificant, even a tax fraud that involved multiple wealthy individuals, including the defendant, in an effort to deprive the IRS of millions of dollars. Such a sentence would provide a would-be tax cheat every incentive to orchestrate a tax fraud scheme— the financial reward is very high, the chance of being caught and successfully prosecuted is very low, and the punishment in the unlikely event of a successful prosecution is minimal (home confinement and the requirement to pay back the stolen money, which should have been paid to the Government in the first place). Respectfully, that is *not* the message that this Court should send to the public through its sentence of von der Goltz.

As Judge Weinfeld aptly observed in a pre-Guidelines setting:

> This court has long had the view that income tax evasion cases where defendants are found guilty, whether upon their pleas of guilty or after jury verdict, require a term of imprisonment. The income tax laws of our country in effect reflect an honor system under which the citizens are required to cooperate with the government, to file true and accurate returns. I have been of the view that unless a citizen lives up to his responsibility there must follow, barring an extraordinary situation, a term of imprisonment as an example to other people in the community.

*United States v. Tana*, 85 Cr. 1119 (EJW) (S.D.N.Y. June 17, 1986; Sentencing Tr. 12-13). Judge Gardephe echoed this view in a more recent case involving a defendant who utilized an undeclared Swiss bank account and caused hundreds of thousands of dollars of tax loss, resulting in a Guidelines range of 24 to 30 months:

> Our tax system is, at bottom, a voluntary one. Those who use sophisticated means of tax evasion, the sorts of sophisticated means seen here, when their activities come to light they must be punished in a manner that will discourage others from engaging in similar conduct. I believe in the views of Judge Weinfeld, for whom I have the greatest respect, and specifically his views as expressed in the case of *United States v. Tana*, that absent extraordinary circumstances, cases of significant tax evasion often call for a sentence of imprisonment. There's nothing about the facts here that suggest to me that a different outcome is appropriate.

*United States v. Werdiger*, 10 Cr. 325 (PGG) (S.D.N.Y. Nov. 9, 2011, Sentencing Tr. 49-50); *see*

44

*also United States v. Trupin*, 475 F.3d 71, 76 (2d Cir. 2007) (holding that a seven-month prison sentence for multi-year tax evasion scheme with a tax loss of $1.2 million failed to reflect seriousness of offense, observing that a tax evader, in effect, "st[eals] from his fellow taxpayers through his deceptions"); *United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2010) ("Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.").

In a recent case involving a business owner defendant who diverted corporate receipts over a three-year period, resulting in a tax loss of between $250,000 and $550,000 and a Sentencing Guidelines range of 18 to 24 months, Judge Hellerstein imposed an 18-month sentence on the 54-year-old, first-time offender, explaining that:

> I think the obligation to pay taxes is basic to our civilization. It makes it possible to have a lawful society. You read every day of crimes and violence in our country. But so much so in so many other countries where people can't get out of their house without fearing their lives. Where the path of getting food is strewn with threats and violence against them.

> In order to have a society, you must have money. You must be able to pay what society requires. And its basic functions of policing and other functions of making sure there is a safety net under people. If people don't pay their taxes, they cheat each other. Your not paying taxes cheats me. If I don't pay my taxes, I cheat you. It's as bad, in many ways, as ripping off the delivery worker that the last fellow did. You're ripping off everybody else by not paying your share of taxes. So I look upon this and I think the guidelines have it right here. I think a year and a half, 18 months, is a just sentence. I impose it.

> I think you're going to have to reflect on what you did and the seriousness of what you did. You just can't make it good by paying the back tax. You've got to understand that when you do something bad, you get punished. It's got to be a lesson to everyone else. Everyone else is tempted to draw a line and cheat a little bit, get an extra edge.

*United States v. Joseph Ciccarella*, 16 Cr. 738 (AKH) (Sentencing Tr. 22-23).

Certainly, this logic applies with even greater force to von der Goltz's conduct, which was more serious and went on for a much longer period of time.

45

In short, compliance with the Internal Revenue Code will be unattainable if the general public believes there are no meaningful repercussions for failing to comply with the tax laws. Sentencing von der Goltz to a significant term of incarceration is, therefore, necessary to send the message to others in our society that systematic and repeated efforts to cheat on one's taxes will be met with serious punishment.   Or as the Court succinctly put it in *Ciccarella*:   "You've got to understand that when you do something bad, you get punished."   *Id.*

### D.        Avoidance of Unwarranted Sentencing Disparities

A sentence such as that sought by the Government would also comport with "the need to avoid unwarranted sentence disparities among defendants."   18 U.S.C. § 3553(a)(6).   While avoidance of national sentencing disparities is the primary concern animating this sentencing factor, *United States v. Ghailani*, 733 F.3d 29, 55 (2d Cir. 2013), the Court may also consider the potential for disparity between co-defendants.   *United States v. Johnson*, 567 F.3d 40, 54 (2d Cir. 2009).   In terms of national sentencing disparities, the Government attaches for the Court's consideration a chart of sentences in other recent tax cases (or cases that had a significant tax component), including cases with comparable loss amounts to the loss amount in this case.   (*See* Exhibit E (the "Sentencing Chart")).   The Sentencing Chart breaks out the sentences imposed and various other sentencing data in a broad variety of criminal tax contexts, demonstrating that sentences within or slightly below the Guidelines Range are the norm for complex tax cases.

The United States Sentencing Commission also maintains data showing that the average term of incarceration for all tax fraud offenders who were sentenced in 2017 was 17 months.   *See* U.S. Sentencing Comm'n, Quick Facts on Tax Fraud Offenses (2017) at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Tax_Fraud__FY17.pdf.

That average, however, is largely based on defendants who had significantly lower culpability than von der Goltz.   The average minimum of the Guidelines range for these defendants was between 24 and 26 months.   *Id.*   Here, the Guidelines Range is 97 to 121 months (or, even if the Court were to accept von der Goltz's view of the Guidelines, 87 to 108 months).   Furthermore, the median tax loss was $277,576, and 87.2% of all taxes cases involved a tax loss of $1.5 million or less.   Here, the tax loss from the defendant's own evasion was over ten times the median tax loss in tax cases.

A non-incarceratory sentence for von der Goltz would be a significant deviation from the norm of tax sentences in this District, which reflect the severity of the crime of tax fraud, and the particular need for deterrence in this context.   Even during the present COVID-19 pandemic, Judge Stein recently imposed an incarceratory sentence for a tax fraud defendant.   *See United States v. Smith*, No. 07 Cr. 453 (SHS) (S.D.N.Y. June 8, 2020).   In that case, the defendant, from approximately 1998 to 2003, took steps, including by making false statements to the Government, to hide his personal theft of over $7.7 million from the U.S. Treasury, along with his role in working with an accounting firm to defraud the IRS out of over $100 million dollars.   (*Id.*, Dkt No. 359, Sentencing Tr. 10, 14-15).   After having fled to Canada, and being extradited back to the United States, the defendant pleaded guilty to one count of filing a false or fraudulent tax return for the calendar year 1999, in violation of 26 U.S.C. § 7206(1).   (*See id.* at 10).   Judge Stein sentenced the defendant to a Guidelines sentence of 36 months' imprisonment, which represented the statutory maximum, despite the fact that he acknowledged that the defendant was "very generous" with money, including by donating $1 million to the American Cancer Society (*see id.* at 34-35).   Similarly, prior to the beginning of the pandemic, courts in this District and elsewhere

47

have routinely meted significantly incarceratory sentences for tax evaders such as von der Goltz, even where their Guidelines range is significantly lower than that which is applicable here.

Von der Goltz relies heavily on a recent case in which a defendant did not receive an incarceratory sentence, *United States v. Cohen*, No. 19 Cr. 741 (WHP). In that case, however, the defendant's Guidelines range was 30 to 37 months' imprisonment after pleading guilty to conspiracy to commit securities fraud, wherein the defendant gained $260,000 as a result of his fraud. (*See id*., Dkt. No. 44, at 8-9). The variance that von der Goltz seeks here is far greater than in that case.

Nor would a substantial period of incarceration be unwarranted when considered against the sentences that will be received by the defendant's co-conspirator Richard Gaffey. While each of the defendants played an important role in the conspiracy, von der Goltz's conduct in this case was particularly egregious. Most importantly, the tax fraud was instigated by and for the benefit of von der Goltz. Von der Goltz began using Mossack Fonseca to evade taxes before engaging Gaffey, and brought Gaffey into the scheme in approximately 1999. While Gaffey ultimately assisted other taxpayers in evading taxes as well, those were taxpayers introduced to Gaffey through von der Goltz. In terms of relative culpability, it is the Government's view that von der Goltz's culpability exceeds that of Gaffey.[8]

---

[8] Gaffey pleaded guilty to an aggravated identity theft charge, in violation of 18 U.S.C. § 1028A. The primary reason why von der Goltz was not also charged with this crime was because he was arrested after a flight from Europe to Costa Rica, whereupon he was denied entry and was forced to return to Europe through London. When he arrived in the United States, von der Goltz was thus shielded by the rule of specialty from having additional charges brought against him. His conduct, in possessing and using the identity of his elderly Guatemalan mother in furtherance of his tax evasion and money laundering, was the same as that of Gaffey. But because Gaffey did not leave the United States during the pendency of the investigation, only he faces a mandatory minimum term of imprisonment.

*       *       *

The facts of this case warrant a significant penalty.   The defendant used his sophisticated education to create an elaborate sham, ripping off the American taxpayer and defrauding the American government.   When confronted by law enforcement, he lied.   When confronted with the spectre of criminal charges after the publication of the Panama Papers, he fled.   Now, over thirty years after his criminal conduct began, the defendant finally faces justice.   A significant term of imprisonment, as contemplated by the Sentencing Guidelines, is necessary in this case.

## VI.     ORDER OF RESTITUTION AND FINE

Prior to sentencing, the Government intends to submit a proposed Order of Restitution, in accordance with the terms of the parties' agreement dated May 19, 2020, under which von der Goltz has agreed to file with the IRS, and provide copies to this Office, accurate amended individual tax returns for the calendar years 2000 through 2017, or enter into a Form 870 Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment, for the additional tax due and owing.

Additionally, the Government concurs with the Probation Office that a fine within the Guidelines range is warranted here.   Von der Goltz's suggestion that he lacks the ability to pay any fine is not credible.   His financial disclosures, as described at length in the PSR, are murky and it appears that he has not been fully responsive to the inquiries of the Probation Office. Nonetheless, it is clear that he continues to maintain substantial holdings in a number of foreign companie.   Gaffey, von der Goltz's longtime accountant, valued von der Goltz's direct investments (not including the private equity investments which interest he has forfeited) at over $21 million in 2018, and even if that valuation was inflated and theses assets have lost a substantial

amount of that value, von der Goltz's ownership of them would still put him in position to pay a fine within the Guidelines range.

## VII.   CONCLUSION

The Government respectfully submits that, based on the facts and arguments set forth above, a significant incarceratory sentence is appropriate here.

Dated:   New York, New York
          July 23, 2020

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney
Southern District of New York

DEBORAH CONNOR
Chief, Money Laundering and
Asset Recovery Section
Criminal Division

By:      ___/s/ Thane Rehn_____
         Eun Young Choi / Thane Rehn
         Assistant United States Attorneys

         Michael Parker
         Trial Attorney, Criminal Division

cc:      Defense counsel (by ECF)

50